**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

Estate of JAMES RAMIREZ, Deceased,
by EUGENIO MATHIS, Personal Representative
of the Estate of James Ramirez,

     Plaintiff,

v.

CORECIVIC OF TENNESSEE d/b/a CORECIVIC, INC;
CORRECTIONAL MEDICINE ASSOCIATES, P.C.;
CIBOLA GENERAL HOSPITAL, INC.,
MEDICAL OFFICER JOSEPH BOUNDS, RN;
OFFICER WILLIAM SNODGRASS;
OFFICER [FNU] BULLOCK;
WARDEN ROBERT NILIUS;
CHIEF MEDICAL OFFICER KEITH IVENS, MD; and
JOSHUA LARSON, MD.

     Defendants.

No. _____

**COMPLAINT FOR VIOLATIONS OF RIGHTS UNDER THE UNITED STATES
CONSTITUTION, AMERICANS WITH DISABILITIES ACT, AND
THE REHABILITATION ACT**

COMES NOW PLAINTIFF Eugenio Mathis ("Plaintiff"), as personal representative

of the estate of James Ramirez ("James" or "Mr. Ramirez"), deceased, by the undersigned

counsel, and alleges and complains as follows:

**I.    PARTIES, JURISDICTION, & VENUE**

1.    This is a civil action authorized by: 42 U.S.C. § 1983 to redress the deprivation,

under color of law, of substantive due process rights secured by the Fourteenth Amendment of

the United States Constitution, and by 42 U.S.C. § 12132 and 29 U.S.C. § 794, Section 504 of

the Rehabilitation Act of 1973, for discrimination on the basis of disability.

1

2.     The United States District Court of New Mexico is an appropriate venue under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in New Mexico.

3.     Plaintiff Eugenio Mathis is a resident of San Miguel County, New Mexico, and is the personal representative of the Estate of James Ramirez. *See In re: James Ramirez*, D-412-CV-2022-00106. Plaintiff brings this action on behalf of the Estate of James Ramirez. James Ramirez was a pre-adjudication detainee at Cibola County Correctional Center (CCCC) under the care and custody of Defendants while awaiting trial.

4.     Defendant CoreCivic of Tennessee, d/b/a CoreCivic, Inc. (CoreCivic), is a private, for-profit corporation that receives federal funding. CoreCivic was specifically organized to operate, staff, and manage prison facilities. For purposes of this claim, CoreCivic operated out of Milan, Cibola County, New Mexico. At all relevant times, Defendant CoreCivic employed, retained, trained, and exercised direct control over the individually named Defendants who were employees, contractors and/or agents of CoreCivic. CoreCivic is headquartered in Brentwood, Tennessee.

5.     Defendant Correctional Medicine Associates, P.C. (CMA) is a private, for-profit corporation that receives federal funding. Upon information and belief, CMA is organized as a subsidiary of, partner to, or joint venture with CoreCivic to employ certain medical staff to provide direct care to detainees and to supervise CoreCivic medical staff in the provision of care to detainees. At all relevant times, Defendant CMA employed, retained, trained, and exercised direct control over the individually named Defendants who were employees, contractors and/or agents of CMA. CMA is believed to be headquartered in Brentwood, Tennessee.

6.      Defendant Cibola General Hospital, Inc., is a domestic corporation that receives federal funding. Cibola General's principal place of business is: 1016 E. Roosevelt Ave., Grants, New Mexico. At all relevant times, Cibola General operated, supervised, directed, and controlled Cibola General Hospital (Cibola General) in Grants, New Mexico.

7.      Defendant Robert Nilius was, at the time of James Ramirez's death, Warden of CCCC. Defendant Nilius had a non-delegable duty to ensure that the CCCC met Constitutional standards. Defendant Nilius also had a non-delegable duty to ensure that individuals in custody at CCCC were safe, free from mistreatment and unnecessary pain and suffering, and that each individual received medical care, among other things. As Warden of CCCC, Defendant Nilius also had a duty to avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez. Finally, Defendant Nilius, as Warden of CCCC, had a duty to act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez.

8.      Defendant Correctional Officer William Snodgrass was, at the time of James Ramirez's death, a Captain and Shift Supervisor employed by CoreCivic at CCCC. At all times material to this lawsuit, Defendant Snodgrass had a duty to ensure that detainees housed under his supervision, including James Ramirez, were safe, free from unwanted and unnecessary pain and suffering, and that they received medical care if the medical condition was sufficiently serious that it would have been obvious that even a lay person would easily recognize the necessity for a doctor's attention. Defendant Snodgrass also had a duty to ensure Mr. Ramirez was not in constant pain and suffering, and to ensure that the lack of medical care would not result in an increase in his injuries. Finally, as a supervisor of other correctional officers and staff, Defendant Snodgrass had a duty to 1) avoid the creation or enforcement of any policy that caused

3

constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez.

9. Defendant Bullock was, a at the time of James Ramirez's death, a supervising officer employed by CoreCivic and working at CCCC. At all times material to this action, Defendant Bullock had a duty to ensure that detainees housed under his supervision, including James Ramirez, were safe, free from unwanted and unnecessary pain and suffering, and that they received medical care if the medical condition was sufficiently serious that it would have been obvious that even a lay person would easily recognize the necessity for a doctor's attention. Defendant Bullock also had a duty to ensure Mr. Ramirez was not in constant pain and suffering, and to ensure that the lack of medical care would not result in an increase in his injuries. Finally, as a supervisor of other correctional officers and staff, Defendant Bullock had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez.

10. Defendant Medical Officer Joseph Bounds, RN, was, at the time of James Ramirez's death, employed by CoreCivic and working as a supervising nurse at CCCC. At all times material to this action, Defendant Bounds had a duty to ensure that detainees treated under his supervision, including James Ramirez, received medical care that was objectively reasonable. As a supervisor of medical officers and staff, Defendant Bounds had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez.

11.    Defendant Keith Ivens, MD, was, at the time of James Ramirez's death, an employee and agent of CoreCivic and/or CMA. Upon information and belief, Defendant Ivens was the Chief Medical Officer of CoreCivic and the on-site medical doctor supervising the medical staff at CCCC. Additionally, Ivens was responsible for approving "clinical pathways for various diseases and medical policies" by the medical staff at CCCC. At all times material to this action, Defendant Ivens had a duty to ensure that detainees treated under his supervision, including James Ramirez, received medical care that was objectively reasonable. As a supervisor of medical officers and staff, Defendant Ivens had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez.

12.    Defendant Joshua Larson, MD, was, at the time of James Ramirez's death, a medical doctor at Cibola General Hospital emergency department. Upon information and belief, Defendant Larson resides in New Mexico.

13.    At all relevant times, the individual Defendants acted under the color of law within the scope of their duties and employment.

## II.    FACTUAL BACKGROUND

### Duties of a Private Detention Facility

14.    Prison corporations that operate private detention facilities by agreement with the federal, state or local governments remain subject to constitutional, statutory, and contractual obligations.

15.    Private detention facilities must maintain a secure facility that prevents violence and harm to staff and incarcerated individuals.

5

16.     Private detention facilities must implement policies to protect individuals from inmate-on-inmate violence, excessive use of force by staff, and self-harm risks.

17.     Private detention facilities must train staff in segregation procedures, use-of-force policies, de-escalation tactics, and emergency response protocols.

18.     Private detention facilities must provide sufficient supervision and staffing levels to prevent harm, per contractual and constitutional requirements.

19.     Private detention facilities must deliver constitutionally adequate medical and mental health care in compliance with the Fourteenth Amendment for pretrial detainees.

20.     Private detention facilities must adhere to national standards of medical care, including access to physicians, nurses, and specialists when needed.

21.     Private detention facilities must ensure timely response to medical emergencies and chronic care needs, including mental illness.

22.     Private detention facilities must maintain proper medical recordkeeping and ensure continuity of care.

23.     Private detention facilities must adhere to federal laws, such as the Americans with Disabilities Act (ADA) to ensure accommodations and protection from abuse.

24.     Private detention facilities must provide access to grievance procedures and legal resources.

25.     A significant portion of incarcerated individuals have mental health conditions, including severe disorders such as schizophrenia, bipolar disorder, and major depression.

26.     Medical providers in any correctional facility have a duty to screen, diagnose, and provide timely, adequate mental health care, including crisis intervention, suicide prevention, chronic disease management, and continuity of care.

*Cibola County Correctional Center*

27.     CoreCivic, a private for-profit prison corporation owns and operates the Cibola County Correctional Center (CCCC), located in Milan, New Mexico.

28.     CCCC was originally under contract with the Federal Bureau of Prisons (BOP) to house federal inmates. However, in 2016, the BOP terminated its contract with CCCC due to concerns over inadequate medical care and multiple inmate deaths.

29.     CCCC has a capacity of approximately 1,145 individuals. Most individuals housed at CCCC are under the jurisdiction of Cibola County, the U.S. Marshals Service, U.S. Immigration and Customs Enforcement (ICE), or The Pueblo of Santa Ana.

30.     Between January 31 and February 2, 2022, the American Commission on Accreditation (ACA) conducted a scheduled evaluation of CCCC. The findings of the ACA committee revealed multiple healthcare staff vacancies, including two FTE mental health practitioners, eight RN positions, and one FTE physician position. *See Reaccreditation Audit*, Commission on Accreditation for Corrections Standards Compliance (Jan. 31 – Feb. 2, 2022).

31.     The ACA committee noted that clinical management of medical services at CCCC is provided by a "corporate physician who approves clinical pathways for various diseases and medical policies." ACA's report further explained that this "corporate medical director" also happened to be both CCCC's physician, with 24-40 hours per week devoted to their position at CCCC.

32.     Upon information and belief, this "on-site physician" in January through February 2022 was Defendant Keith Ivens, MD.

33.     In August 2022, a federal oversight office conducted an unannounced inspection of CCCC. Results of the unannounced inspection were released in an October 2023 report ("OIDO Report").[1]

34.     The OIDO Report revealed CCCC's medical staff had a 36 percent vacancy rate as of August 2022. According to the Report, the low staffing levels likely contributed to deficiencies found in the provision of medical services to detainees, including delays in distributing prescribed medications and improper monitoring and follow-up for prescribed psychiatric medications.

35.     CCCC's procedures for placement of detainees in segregation were also found to be deficient by the inspectors. Specifically, the inspectors found that CCCC medical staff failed to complete necessary forms for detainees placed in segregation, and facility management failed to ensure completeness and correctness of those forms. According to the OIDO Report, the failure to complete this documentation puts detainees in danger of inappropriate placement and retention in segregation.

36.     Finally, the OIDO report calls out CCCC for lapses in training and documentation, particularly in areas of pharmaceutical medication handling, medical records, and documentation of staff credentials and certifications.

***Prevalence of Drugs at CCCC***

37.     In recent years, CCCC has become notorious for drug trafficking and widespread drug use among inmates.

---

[1] *See OIDO-23-013 Cibola County Correctional Center August 9-11, 2022*, David D. Gersten Acting Ombudsman Office of the Immigration Detention Ombudsman (Oct. 23, 2023), at https://www.dhs.gov/sites/default/files/2023-12/23_1013_OIDO%20_Final-Inspection-Report-Cibola-County-Correctional-Center.pdf. Although the inspection was performed by an entity charged with oversight of ICE detainees, the findings regarding medical staffing, pharmaceutical services would apply to other detainees, since these services are provided by the same staff. Arguably, the deficiencies spotted in segregation procedures also apply to other detainees, since the standard procedures appear to be consistent, regardless of detainee status and CCCC's internal segregation policies do not appear to differentiate between detainees.

38.     CCCC's issues with drugs became so severe that federal judges in the District of New Mexico and the United States Marshals Service and brought their concerns to the United States Attorneys' Office and the Federal Bureau of Investigation (FBI).

39.     The FBI Albuquerque Division Violent Gang Task Force investigated the CCC and uncovered a complex and lucrative drug trafficking network within CCCC.

40.     Specifically, members of prison gangs at CCCC had been working with associates outside of prison, along with CCCC employees, to smuggle drugs and other contraband into CCCC.

41.     According to a search warrant affidavit, FBI Special Agent Jordan Spaeth found that the CCCC's drug problem was a "startling anomaly" among New Mexico's detention centers due to the "sheer volume of controlled substances being trafficked within the facility."

42.     In 2021, multiple instances were recorded in which tennis balls containing drugs were thrown over the fence of CCCC from outsiders. On at least one occasion, inmates were able to recover the drugs. It is believed that because of the proximity of CCCC to public roadways, this type of activity is common, but usually goes undetected.

43.     Upon information and belief, CCCC employees have been responsible for drugs and contraband entering CCCC as well.

44.     On August 29, 2023, former CCCC Correction Officer (CO) Dennis Dean Garcia was sentenced to 24 months of imprisonment followed by three years of supervised release for attempting to provide contraband in prison.[2]

---

[2] *See* Press Release, *Former USMS Detention Officer Sentenced for Attempt to Provide Contraband in Prison*, U.S. Dept. of Justice, Office of the Inspector General (Aug. 29, 2023), https://oig.justice.gov/news/press-release/former-usms-detention-officer-sentenced-attempt-provide-contraband-prison.

45.    Garcia, who was employed as a CO at CCCC from January 2019 until February 22, 2021, had been investigated after monitors of surveillance video at CCCC observed Garcia remove something from his pocket and place it in a storage room. The item contained 104 grams of methamphetamine.[3]

46.    During the FBI's investigation of CCCC, investigators were told by approximately two dozen sources from within the facility that certain corrupt COs would regularly smuggle drugs and other contraband into CCCC for inmates.

47.    One source reported knowing a CO who would hide drugs in his boot to bring them into CCCC. The CO would then deliver the drugs to an inmate by dropping the package into the cell during a "search," outside the view of surveillance cameras.

48.    FBI investigators also learned of a former captain and shift supervisor at CCCC who had been actively involved in drug trafficking while at CCCC. Allegedly, the captain worked with several porters—inmates who would distribute drugs around the facility. When drugs were found in an inmate's cell by COs, this captain directed the officers to refrain from field testing the drugs and then deleted photo and video evidence of the drugs.

49.    The transfer of drugs and other contraband is sometimes achieved by hiding the contraband inside food carts. CCCC facilitates distribution of contraband by permitting the free movement of carts between pods without supervision.

---

[3] *See* Press Release, *Former corrections officer arraigned on drug trafficking and contraband charges*, U.S. Attorney's Office, District of New Mexico (Feb. 3, 2022), https://www.justice.gov/usao-nm/pr/former-corrections-officer-arraigned-drug-trafficking-and-contraband-charges.

50.     On November 1, 2024, the U.S. Attorney's Office, District of New Mexico, announced a major "dismantling" of the drug trafficking network associated with CCCC.[4] The joint operation included multiple search warrants, indictments, and arrests.

51.     On January 25, 2025, Michael "Gomer" Ernest Garcia was arrested in connection with the FBI investigation of drug trafficking at CCCC.[5]

52.     Upon information and belief, multiple individuals in CCCC custody have lost their lives in recent years due to drugs that were brought into CCCC illegally. In June 2021, a male detainee was discovered dead in his cell at CCCC. The Office of Medical Investigator (OMI) determined that this detainee died from the toxic effects of fentanyl, methamphetamine, and morphine. On November 14, 2021, Jasmine Williams was discovered dead in her cell. Her death was also determined to be caused by the toxic effects of fentanyl and other drugs.

***James Ramirez***

53.     James Ramirez was a pre-adjudication detainee housed at CCCC from September 7, 2021, until his death at age 28 on February 15, 2022.

54.     Mr. Ramirez had a documented history of schizophrenia with paranoia, including auditory hallucinations and prior hospitalizations.

55.     Mr. Ramirez's schizophrenia was documented to substantially limit his ability to organize his thoughts, retain information, communicate and interact with others, and regulate his mood and emotions. (42 U.S.C. § 12102(2)).

---

[4] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Target Drug Trafficking Operation Linked to Federal Correctional Facility,* U.S. Attorney's Office, District of New Mexico (Nov. 1, 2024), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-target-drug-trafficking-operation-linked-federal-0.
[5] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Disrupt Contraband Operation at Cibola County Correctional Center with Arrest*, U.S. Attorney's Office, District of New Mexico (Jan. 25, 2025), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-disrupt-contraband-operation-cibola-county-correctional.

56.     Mr. Ramirez required anti-psychotic medication. Without medication, Mr. Ramirez would suffer audial hallucinations. Specifically, Mr. Ramirez reported he would hear the voice of the "Predator."

57.     In August 2021, Mr. Ramirez sustained multiple gunshot wounds during an incident that resulted in several bullets or bullet fragments being lodged in his body. These injuries caused chronic pain and discomfort and likely exacerbated his psychiatric conditions.

58.     Following a hospitalization for his injuries, and before being transferred to CCCC, Mr. Ramirez was on a mental health "Hold" at the Bernalillo County Metropolitan Detention Center ("MDC"), where he was assessed and started on psychiatric medications.

59.     Upon Mr. Ramirez's initial intake at CCCC, CoreCivic and Correctional Medicine Associates and their respective employees, including Defendant Keith Ivens, MD, were made aware of Mr. Ramirez's history of schizophrenia, auditory hallucinations, paranoia, anxiety, difficulty organizing thoughts, substance abuse disorder, asthma, recent injuries, ongoing wounds, and his associated care needs.

60.     When Mr. Ramirez was released from MDC on September 7, 2021, he had been provided with several days' worth of his psychiatric medications to ensure he had continuity in his medication regimen.

61.     When Mr. Ramirez underwent CoreCivic's "Comprehensive Mental Health Evaluation" on September 9, 2021, it was noted that Mr. Ramirez had not received his psychiatric medications for three days at that point.

62.     On September 10, 2021, CCCC tele-health psychiatrist Anna Ortiz, MD, prescribed Mr. Ramirez multiple psychiatric medications, but there is little evidence of a full psychiatric evaluation of Mr. Ramirez.

12

63.     On December 20, 2021, forensic psychologist Julie Brovko, Ph.D., requested Mr. Ramirez' medical and mental health records as part of a court-ordered evaluation of Mr. Ramirez's competency to stand trial.[6]

64.     Years prior, Mr. Ramirez had been found to be unable to participate in legal proceedings because of his mental illness.

65.     On December 20, 2021, Dr. Ortiz responded to Dr. Brovko's inquiry, representing that Mr. Ramirez was not having any hallucinations, was feeling well and in a stable mood, and was "without psychosis."

66.     However, Dr. Ortiz fails to report to Dr. Brovko that Mr. Ramirez had been reporting that he feared for his life due to threats from other detainees. These "grievances" were taken at face value, prompting security staff to transfer Mr. Ramirez for his "safety."

67.     Dr. Ortiz and the mental health staff at CCCC were either unaware of these grievances or did not consider them as indicators that Mr. Ramirez may have been experiencing psychosis.

68.     Even when a complaint was investigated by CCCC staff, and Mr. Ramirez's fears were deemed unsubstantiated and dismissed as "paranoia," Mr. Ramirez was not referred to mental health providers for a psychiatric re-evaluation.

69.     In January 2022, United States District Judge Martha Vazquez suspended criminal proceedings against Mr. Ramirez and ordered that the government make arrangements for Mr. Ramirez to receive psychiatric care at a Bureau of Prisons (BOP) facility.

---

[6]When Mr. Ramirez was detained in California years prior, he was deemed not competent to stand trial and was Mr. transferred to Patton State Hospital for mental health treatment.

70.    That same month, Mr. Ramirez again reported to COs that he feared for his life. Despite James' history of schizophrenia and hallucinations, no mental health or psychiatric re-evaluation was ordered for Mr. Ramirez.

71.    On or about February 9, 2022, Mr. Ramirez was placed in CCCC "segregation" or solitary confinement.

72.    CoreCivic confined and kept Mr. Ramirez in a solitary cell without referring him for a single mental health risk assessment.


[Proceed to following page.]

10-101A

## USMS CONFINEMENT RECORD (CR)

| Facility Name | Cibola County Correctional Center | | | | | |
|---|---|---|---|---|---|---|
| Detainee Name | Ramirez, James | | | Detainee Number | 63570509 | |
| Date of Placement | 2/9/2022 | Time | 1400 | Original Housing | 800B | |
| Placement Ordered By | S/S DELGARITO | | | Tentative Release Date | N/A | |

I.   **RESTRICTIVE HOUSING STATUS - INITIAL (Check One):**

☐ Disciplinary Segregation   ☒ Administrative Segregation – Protective Custody   ☐ Administrative Segregation-Preventive
☐ Administrative Segregation- Investigation   ☐ Administrative Segregation – Involuntary PREA Placement

*ANY TIME A DETAINEE'S STATUS CHANGES, ANOTHER 10-101A MUST BE COMPLETED*

II.   **REASON FOR PLACEMENT (Check One):**

☐ Disciplinary Infraction of offenses for which disciplinary segregation is an approved sanction
☒ Separation from general population for the purpose of protection from other detainees for reason of personal safety
☐ Poses a serious threat to life, property, self, staff, or other detainees
☐ Poses a threat to the security of the orderly operation of the facility
☐ Administrative order from the Chief of Security or higher authority or contracting agency
☐ Preventive Measures to ensure detainee and staff safety
☐ Investigation only after officials conclude "poses a threat to life, property, self, staff, other detainees and public.
☐ Involuntary PREA Placement – No alternative means of separation can be arranged (note reason why below)
    Reason why no alternative means of separation or other housing option could not be arranged _____

III.   **SPECIAL CONDITIONS/PRECAUTIONS:** (**If "YES", you must explain. Attach additional sheets, if necessary.)
Recreation/Exercise Requirements: ☒ NO ☐ YES:_____
Restrictions on Personal Property (imposed by the placing authority for cause): ☒ NO ☐ YES:_____
Known Assault Risk: ☒ NO ☐ YES: _____
Modified Restraint Procedures: ☒ NO ☐ YES:_____
Medical/Mental Health Care Personnel Conduct Risk Assessment Prior to Placement in Restrictive Housing: ☒ NO ☐ YES:____
Disability: ☒ NO ☐ YES: _____
Special Diet (medical or religious): ☒ NO ☐ YES:_____
Medication Requirements (current prescriptions): ☒ NO ☐ YES:_____
Additional Search Requirements: ☒ NO ☐ YES:_____
Other: ☒ NO ☐ YES:_____

IV.   Is the detainee's behavior abnormal, aggressive, violent, or unusual? ☒ NO ☐ YES *If "YES":_____

V.   **ADMINISTRATIVE REVIEW:** This section must be completed for initial placement, not required for a change in status.
The review must be conducted within 24 hours of placement by the Chief of Security/Unit Management or higher authority.

☒ Approved   ☐ Denied   ☐ Modified (Provide Comment):_____

| Printed Name | L. ML. | Title | 103 | | |
|---|---|---|---|---|---|
| Signature | | Date | 2-10-22 | Time | 1300 |

VI.   RELEASE:

---

10-101C

## Multi-Disciplinary Committee CONFINEMENT REVIEW

| Facility Name | Cibola County Correctional Center | | |
|---|---|---|---|
| Detainee Name | Ramirez, James | Detainee Number | 63570509 |
| Date of Review | 2/10/22 | Date of Placement | 2/10/2022 |

I.   CURRENT STATUS (Check One):

☐ Disciplinary Segregation   ☐ Administrative Segregation – Protective Custody   ☐ Administrative Segregation-Investigation
☒ Administrative Segregation   ☐ Administrative Segregation – Involuntary PREA Placement

II.   Was the detainee present for the review? ☐ Yes ☐ No Ramirez, James

III.   Disciplinary Infraction at level to warrant D/S is an approved sanction? ☒ Yes ☐ No

IV.   Was Less Restrictive Housing options reviewed? ☐ Yes ☐ No

V.   Has the detainee been seen by health services staff daily? ☒ Yes ☐ No If no, explain below:
_____

VI.   Was the detainee identified with mental health illness ☐ Yes ☒ No If so did mental health staff conduct a review prior to placement in restrictive housing. ☐ Yes ☒ No has mental health practitioner conduct a face-to-face clinical contact at least weekly. ☐ Yes ☐ No

73.    As evident from CoreCivic's confinement paperwork, excerpted on the prior page, Mr. Ramiraz's psychiatric diagnosis, paranoia, and mental health history were specifically denied by CoreCivic staff.

74.    Records from Mr. Ramirez's isolation paint a bleak picture of his existence in solitary. He was never recorded as being let out for any form of recreation. From February 9 through 12, 2022, Mr. Ramirez was not recorded as showering or receiving clean clothes or linens. No activity whatsoever is recorded for February 13, 2022, suggesting James may not have even eaten anything that day.

75.    Medication administration records show that for most of his time in solitary confinement, Mr. Ramirez did not receive his prescribed antipsychotic medications. (Mr. Ramirez should have received medications twice daily, but no delivery was recorded February 9, the morning of February 10, any time February 12, or the morning of February 13, 2022.)

76.    CoreCivic and CMA and their respective employees and agents never provided Mr. Ramirez with reasonable accommodations or protections in order for Mr. Ramirez to safely be placed in segregation or confined housing at CCCC.

77.    Upon information and belief, Mr. Ramirez's mental and physical health were negatively impacted by his confinement to a segregated, solitary cell from February 9 through the morning of February 14, 2022.

### February 14, 2022

*Morning (~36 hours before Mr. Ramirez's death)*

78.    Upon information and belief, sometime in early February 2022, CoreCivic received an order from the U.S. Marshals Service (USMS) for Mr. Ramirez to be transferred out of CCCC for eventual transfer to a BOP hospital for mental health treatment.

79.     This transfer was scheduled for the morning of February 14, 2022.

80.     Upon information and belief, in the early morning hours of February 14, 2022, Mr. Ramirez was discharged from his solitary cell and taken to CCCC's receiving and outgoing station to await transfer by USMS agents.

81.     Nurse Pena was tasked to perform a final medical clearance of Mr. Ramirez prior to his transfer.

82.     Nurse Pena observed that Mr. Ramirez was acting very strangely, repeatedly stating that he just wanted to go to sleep.

83.     Nurse Pena suspected Mr. Ramirez had been exposed to and was under the influence of an unknown substance.

84.     Nurse Pena brought her concerns about Mr. Ramirez to Defendant Bullock.

85.     Nurse Pena requested that Defendant Bullock perform a urine drug screen to evaluate Mr. Ramirez for possible intoxication.

86.     Defendant Bullock refused to facilitate a urinalysis on Mr. Ramirez to test for illicit substances in Mr. Ramirez's system.

87.     Upon information and belief, Defendant Bullock told Nurse Pena that he would not order or facilitate a urinalysis request because his shift was over and he was "out of there."

88.     Mr. Ramirez could not be cleared for transfer out of CCCC due to his condition.

89.     Instead, at or around 7 AM, Mr. Ramirez was placed in the CCCC Medical Unit.

90.     Medical staff observed that Mr. Ramirez began exhibiting severe distress, slurred speech, and loss of coordination.

91.     Mr. Ramirez was exhibiting signs consistent with schizophrenic-related psychosis.

17

92.     As Mr. Ramirez's physical and psychological condition deteriorated, he was moved to a cell in the Medical Unit.

93.     Mr. Ramirez repeatedly tried to get up, and would fall, hitting his head on the hard surfaces in the cell.

94.     Concerned about Mr. Ramirez suffering from a drug overdose, Medical staff administered Narcan to Mr. Ramirez but observed no improvement.

95.     Mr. Ramirez's physical and mental condition worsened, and he began exhibiting self-harm behaviors such as trying to bite his hands.

96.     CoreCivic correctional personnel were called to the Medical Unit to assist in restraining Mr. Ramirez so that he would not hurt himself.

97.     Defendant Snodgrass later reported that Mr. Ramirez was incoherent, smashing his head against the walls and floor, despite verbal commands for Mr. Ramirez to stop harming himself.

98.     Defendant Snodgrass and other correctional staff forced Mr. Ramirez' wrists and ankles into restraints and improvised a restraint to put around Mr. Ramirez's head.

99.     Medical staff observing Mr. Ramirez were concerned about his mental state.

100.    Medical staff escalated their concerns about Mr. Ramirez's mental and physical condition to the supervising nurse, Defendant Joseph Bounds.

101.    Shift Supervisor Snodgrass later reported that he also directed medical staff to contact Dr. Ivens for Mr. Ramirez to be transferred to the hospital.

102.    Defendant Bounds testified in a deposition that through his experience working for CoreCivic, he came to understand that only the medical director (Keith Ivens) could authorize a hospital transport.

103. As detailed by Defendant Bounds, CoreCivic's policy, custom, and practice prohibited the staff at CCCC from transferring Mr. Ramirez to an outside provider for treatment, even when the staff could not diagnose, treat, or manage Mr. Ramirez's symptoms.

104. Upon information and belief, Defendant Ivens refused to approve hospital transport and dismissed even the supervising staff's concerns, stating that Mr. Ramirez was "a security issue now."

105. Upon information and belief, Defendant Ivens was aware that Mr. Ramirez had been diagnosed with schizophrenia with a history of hallucinations and that Mr. Ramirez had been receiving treatment with anti-psychotic medication.

106. Defendant Dr. Keith Ivens, without examining or even seeing Mr. Ramirez, denied him desperately needed medical intervention.

107. Defendant Ivens blocked all other staff from seeking medical treatment on behalf of Mr. Ramirez.

108. As a result of Dr. Ivens's directive, Mr. Ramirez remained in CCCC under forceful restraint and without access to emergency psychiatric care or even basic necessities, such as food and water.

109. Mr. Ramirez had no way of advocating for himself. He was completely at the mercy of the staff at CCCC.

110. Defendant Bounds, the supervising nurse, can be observed on video footage at or around 11:00 AM entering the cell where Mr. Ramirez was being held.

111. Defendant Bounds does not attempt to assess Mr. Ramirez's vital signs, physical injuries, or his medical and psychiatric history.

19

112. Defendant Bounds is heard telling the three officers who are forcefully restraining Mr. Ramirez, "So, as soon as he's with it enough that he can say, 'I give you guys permission to take me to the hospital,' he can go get his lip sutured and then they'll evaluate him and treat him from there."

113. The correctional staff are heard pleading with medical staff for help.

114. At 1:18 PM, Defendant Ivens finally authorized personnel at CCCC to transport Mr. Ramirez to the hospital for medical attention and treatment.

115. During this period of waiting, Mr. Ramirez endured hours of physical restraint by three correctional officers, sustained multiple self-inflicted injuries, and suffered severe pain and trauma which could have been easily avoided with proper medical attention denied by Nurse Bounds, Dr. Ivens and other CoreCivic/Correctional Medicaine Associates employees, staff and agents.

*Afternoon of February 14, 2022 (~29 hours before Mr. Ramirez's death)*

116. Mr. Ramirez arrived at Cibola General Hospital Emergency Department at approximately 1:41 PM, accompanied by CoreCivic Recreation Officer P. Tso and Supervisory Detention Officer (SDO) K. Payton.

117. Defendant Joshua Larson, MD, a doctor employed by Cibola General, attended to Mr. Ramirez.

118. Upon information and belief, Defendant Larson was aware that Mr. Ramirez was a detainee in the custody of CoreCivic.

119. Upon information and belief, Defendant Larson was informed of Mr. Ramirez's history of mental illness.

120.    Upon information and belief, an agreement or understanding existed between CoreCivic and Cibola General to treat individuals in CoreCivic's custody from CCCC.

121.    According to Defendant Larson's medical notes, Mr. Ramirez was "[b]rought in by corrections for repeatedly smashing face on concrete. AMS [Altered mental state], baseball-sized lump on forehead, laceration to R side of head."

122.    Defendant Larson recorded vital signs showing that Mr. Ramirez was medical unstable, including a heart rate of 135 beats per minute, blood pressure of 142/75, and oxygen saturation of 90%.

123.    Defendant Larson also documented that Mr. Ramirez appeared intoxicated and noted that they smelled alcohol on Mr. Ramirez's breath, but that they were unsure what substance Mr. Ramirez had consumed.

124.    Despite Mr. Ramirez's concerning vital signs, the appearance of intoxication, and the possibility of illicit drugs in his system, Defendant Larson and Cibola General staff ordered no bloodwork, lab tests, toxicology screenings, or electrocardiogram (ECG) on Mr. Ramirez.

125.    Despite Mr. Ramirez's history of mental illness, Defendant Larson and Cibola General staff did not refer Mr. Ramirez for psychiatric evaluation.

126.    Defendant Larson effectively withheld any testing on Mr. Ramirez that would have supplied concrete information about any substances Mr. Ramirez was exposed to, or that would have provided markers to guide Defendant Larson and Cibola General staff on how to proceed with treatment of or therapies for Mr. Ramirez.

127.    Instead, Defendant Larson ordered cursory imaging, with the sole purpose of clearing Mr. Ramirez to return to CCCC as quickly as possible.

128.    To address Mr. Ramirez's physical and mental instability, Defendant Larson opted for chemical restraint, ordering a rapid series of sedating medications be administered to Mr. Ramirez.

129.    Upon information and belief, Mr. Ramirez did not consent to being administered sedating medication.

130.    At the direction of Defendant Larson, without performing any bloodwork to determine possible adverse interactions with suspected ingestion of illicit drugs, and without Mr. Ramirez's consent, Mr. Ramirez was administered the following combination of powerful sedatives by staff in the emergency department of Cibola General:

- 2:28 PM: Ativan 2mg
- 2:44 PM: Haldol 5mg
- 2:59 PM: Ativan 2mg
- 3:19 PM: Ketamine 150mg
- 3:38 PM: Ketamine 150mg

131.    Despite being pumped with a cocktail of sedating drugs, Mr. Ramirez was still tachycardic hours later, at the time Mr. Ramirez was discharged back to CCCC.

132.    Dr. Larson and Cibola General participated in restraining and controlling Mr. Ramirez as a detainee in custody, without Mr. Ramirez's consent and with blatant disregard for Mr. Ramirez's documented history of a disabling psychiatric condition.

133.    Dr. Larson and Cibola General were effectively state actors in their coordination with CoreCivic and CMA staff to control and sedate Mr. Ramirez all with no diagnostic testing to insure that the course of action was safe, much less beneficial.

134.    Defendants Larson and Cibola General never treated Mr. Ramirez as a medical patient; they merely acted in concert with CoreCivic and CMA personnel for the sole purpose of restraining Mr. Ramirez so that he could be sent back to CCCC.

135. Since no toxicology reports or drug screenings were performed, Dr. Larson and hospital staff had no way of knowing if the combination of potent sedatives would adversely interact with any intoxicants Mr. Ramirez may have previously consumed or been exposed to at CCCC.

136. Defendant Larson sent Mr. Ramirez, accompanied by correctional officers lacking medical training, back to CCCC.

137. The failure to keep Mr. Ramirez under hospital observation all but guaranteed that whatever physical and mental manifestations Mr. Ramirez faced in the hours and days following would go unmonitored and untreated.

*Evening of February 14, 2022 (less than 24 hours before Mr. Ramirez's death)*

138. At 6:25 PM on February 14, 2022, Mr. Ramirez was transported back to CCCC by CoreCivic staff P. Tso and K. Payton.

139. Upon arrival to the CCCC intake station, Mr. Ramirez was severely incapacitated and fell out of his wheelchair.

140. At approximately 6:45 PM, a Medical Code was called from CCCC's intake station in response to Mr. Ramirez's worsening condition.

141. Nurse Collete Grant, Nurse V. Pena, and Nurse C. Luckey responded to the Medical Code.

142. Grant, Pena, and Luckey found Mr. Ramirez sitting on the floor, unable to support himself.

143. Surveillance video shows that Mr. Ramirez required assistance from two correctional officers to remain in a sitting position and to prevent him from falling to the floor.

144. Mr. Ramirez was minimally responsive, occasionally opening his eyes and moving his head and limbs.

145. At 6:53 PM, Mr. Ramirez was restrained to a gurney and transported to the Medical Unit.

146. In the Medical Unit, Nurse Luckey noted that Mr. Ramirez's heart rate was still elevated at over 110 beats per minute (approximately twice his normal resting heart rate).

147. Medical staff attempted to take other vital signs, but readings were unreliable because of Mr. Ramirez's movement.

148. Mr. Ramirez could not support himself, could not communicate his needs, and his medical status was uncertain.

149. Nurse Luckey called Defendant Keith Ivens to report Mr. Ramirez's condition.

150. Nurse Luckey requested instructions from Defendant Ivens on how to manage Mr. Ramirez.

151. Defendant Ivens did not personally complete an assessment of Mr. Ramirez's condition.

152. Upon information and belief, Defendant Ivens knew that Mr. Ramirez had been chemically sedated at the hospital before returning to CCCC.

153. Defendant Ivens ordered Mr. Ramirez be transported out of the Medical Unit and into restrictive, segregating housing in a solitary cell.

154. This transfer to confinement was ordered unilaterally by Defendant Ivens, without affording Mr. Ramirez any assessment or seeking administrative approval to ensure Mr. Ramirez would be safe in confinement.

155. There is no evidence that Defendant Ivens documented his decision to send Mr. Ramirez to confinement on the evening of February 14, 2022, in a way that could have been reviewed by CoreCivic management.

156. The restrictive housing unit where Mr. Ramirez was confined did not staff any medically trained personnel.

157. Defendant Ivens effectively cut off all medical oversight of Mr. Ramirez by transferring Mr. Ramirez to confinement, where personnel had no medical training.

158. Defendant Ivens ordered medical staff to leave Mr. Ramirez in a cell by himself with no medical oversight or monitoring, despite the uncertainty of Mr. Ramirez's condition.

159. There is also a conflicting record that suggests Dr. Anna Ortiz, the tele-health psychiatrist at CCCC, ordered Mr. Ramirez to be on suicide watch sometime on February 14, 2022, but it is unclear at what time this order was entered.

160. At 8:00 PM, Mr. Ramirez was transported by gurney from the Medical Unit to segregated housing (SHU/RHU A), despite Mr. Ramirez's incoherence and the lack of a complete medical evaluation.

161. Mr. Ramirez was left in a cell by himself with three suicide blankets.

162. Upon information and belief, Defendant Robert Nilius, Warden of CCCC, was kept aware of the situation that had been unfolding with Mr. Ramirez throughout that day.

163. Upon information and belief, Defendant Nilius knew that Mr. Ramirez had been transported to Cibola General for medical attention and was back in CCCC custody.

164. Defendant Nilius knew or should have known that Mr. Ramirez was placed in confinement upon returning to CCCC without the requisite documentation and approval.

25

**February 15, 2022**

165. In the early morning hours of February 15, 2022, a Medical Code was called to Mr. Ramirez's cell due to apparent concerns about his medical status.

166. Responding to the Medical Code, Nurse Luckey observed Mr. Ramirez and noted that he remained minimally responsive, only occasionally opening his eyes and moving his head and limbs.

167. Officers Garcia and Lujan advised Nurse Lucky not to enter Mr. Ramirez's cell to perform an assessment or take Mr. Ramirez's vital signs because they could not ensure her safety.

168. The COs indicated that they would call again for medical assistance if needed, but no additional calls for medical attention were made during the shift.

169. At some point, Officers Garcia and Lujan reported to Defendant Bullock, their supervisor, that they were concerned about Mr. Ramirez's well-being and felt he needed constant monitoring.

170. For unknown reasons, Defendant Bullock dismissed the officers' concerns. He refused their suggestion for additional monitoring of Mr. Ramirez. Defendant Bullock also failed to refer the officers' concerns to medical or mental health staff.

171. Few details are recorded of the events that occurred between 8:00 AM and 1:00 PM on February 15, 2022.

172. At approximately 1:52 PM Sergeant (SDO) Valles reported to Nurse Nicolas Arias that Ramirez had not eaten anything that day.

173. NP Romero-Peralta overheard Valles' report about Mr. Ramirez not eating and (apparently without inquiring about the prior day's events) stated that missing two meals that day did not rise to the level of a hunger strike.

174. Upon information and belief, Mr. Ramirez had not consumed any food or water since February 13, 2022.

175. According to a statement from Dr. Ortiz, around 4:00 PM Nurse Ken contacted her to report he had been monitoring Mr. Ramirez all day and thought Mr. Ramirez was "psychotic."

176. Ortiz responded that she would need to evaluate Mr. Ramirez, but that Mr. Ramirez needed to be on 1:1 observation.

177. Minutes later, Nurse Iredia Odigie entered the restrictive housing unit outside of Mr. Ramirez's cell with the order from Dr. Ortiz.

178. When Nurse Odigie observed Mr. Ramirez, he had no signs of life.

179. Nurse Odigie requested the door to Mr. Ramirez's cell be opened.

180. Correctional staff unlocked the cell door.

181. Nurse Odigie entered the cell and approached Mr. Ramirez. She checked him for a pulse and respirations.

182. Nurse Odigie determined that Mr. Ramirez had no pulse and that he was not breathing.

183. Nurse Odigie began chest compressions and directed the correctional officer to put out a "man down" over the radio.

184. At or about 4:55 PM, a Medical Code was called to Mr. Ramirez's cell.

185. Shortly after, supervising officer Defendant Snodgrass directed staff to call for an ambulance.

186. At 5:05 PM, Narcan was administered to Mr. Ramirez, with no response.

187. At 5:07 PM, emergency medical technicians (EMTs) arrived at CCCC and were led to Mr. Ramirez's cell, where they continued CPR on Mr. Ramirez.

27

188. At 5:18 PM, for unknown reasons, Defendant Snodgrass ordered the unit's activity Log Book be closed, effectively eliminating all written tracking of activities in the unit. (The Log Book was not re-started until 6:20 PM.)

189. At 5:31 PM, CPR was stopped, and emergency responders were escorted out of the Restrictive Housing Unit.

190. At 7:17, Defendant Snodgrass escorted Milan Police Department detectives into the restrictive housing unit and led them to Mr. Ramirez's cell.

191. At 7:19 PM, the coroner was escorted to Mr. Ramirez's cell and at 7:21 PM, Mr. Ramirez was officially pronounced dead.

192. Upon information and belief, Defendants Snodgrass and Bullock had unrestricted and unmonitored access to Mr. Ramirez's cell from 5:18 PM until detectives arrived at 7:17 PM.

## III. COUNTS

### COUNT I
### VIOLATION OF 42 U.S.C. § 1983
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
**(Against Defendants CoreCivic, CMA, Ivens, Bounds, Snodgrass, Bullock, and Nilius)**

193. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

194. At all relevant times, James Ramirez was a pretrial detainee housed at Cibola County Correctional Center (CCCC), making his constitutional rights protected under the Fourteenth Amendment.

195. Defendants were deliberately indifferent to Mr. Ramirez's serious medical needs by failing to provide adequate medical and psychiatric care, ignoring his worsening condition, and failing to transport him to a hospital for timely treatment.

28

196. Defendant Ivens refused to authorize necessary hospital treatment, directly contributing to Mr. Ramirez's death.

197. Defendant Bounds failed to ensure medical protocols were followed, preventing Mr. Ramirez from receiving the care he needed.

198. Defendants Snodgrass and Bullock, as supervisory correctional staff, knew or should have known about Mr. Ramirez's deteriorating condition and failed to intervene.

199. Defendant Nilius, as Warden, failed to maintain policies and oversight to ensure detainees received proper medical treatment.

200. Defendants acted with deliberate indifference to Mr. Ramirez's serious medical needs, violating his Fourteenth Amendment rights.

201. As a direct and proximate result of Defendants' deliberate indifference, Mr. Ramirez suffered unnecessary pain, suffering, and ultimately death. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT II
### VIOLATION OF 42 U.S.C. § 1983
### FAILURE TO PROTECT FROM HARM
**(Against Defendants CoreCivic, CMA, Ivens, Bounds, Snodgrass, Bullock, and Nilius)**

202. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

203. Defendants had a duty to ensure Mr. Ramirez's safety and protect him from known dangers, including drug exposure, improper segregation, and inadequate medical treatment.

204. Defendants knew or should have known that CCCC had an ongoing issue with drug trafficking and that Mr. Ramirez, a detainee with severe mental illness, was vulnerable to harm.

29

205. Despite this knowledge, Defendants failed to take reasonable steps to ensure Mr. Ramirez's safety.

206. Defendant Snodgrass and Bullock refused to take appropriate measures when alerted that Mr. Ramirez was experiencing distress.

207. Defendants Ivens and Bounds refused to provide medical intervention despite clear signs that Mr. Ramirez was in medical crisis.

208. Defendant Nilius failed to implement policies to protect detainees from harm.

209. As a direct and proximate result of Defendants' actions and inactions, Mr. Ramirez suffered severe harm and ultimately died. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1983
## UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT
### (Against Defendants CoreCivic, CMA, Ivens, Bounds, Snodgrass, Bullock, and Nilius)

210. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

211. Defendants subjected Mr. Ramirez to unconstitutional conditions of confinement, including prolonged solitary confinement without proper medical oversight, inadequate nutrition and hydration, and denial of necessary medical care.

212. The conditions Mr. Ramirez endured were objectively unreasonable and caused significant deterioration in his physical and mental health.

213. Defendants knowingly placed Mr. Ramirez in isolation despite his diagnosed mental illness and did so without medical justification.

214. Defendant Ivens ordered Mr. Ramirez to restrictive housing without evaluating him, exacerbating his suffering.

215. Defendants' actions violated Mr. Ramirez's Fourteenth Amendment right to humane conditions of confinement.

216. As a direct and proximate result, Mr. Ramirez suffered severe physical and mental distress leading to his death.

217. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983**
**UNCONSTITUTIONAL POLICIES, PRACTICES, OR CUSTOMS**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS UNDER *MONELL***
**(Against Defendants CoreCivic and CMA)**

218. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

219. CoreCivic, Inc. and CMA were at all relevant times acting under color of and federal law in operating CCCC and providing medical services.

220. CoreCivic, along with CMA, maintained policies, practices, and customs that led to the denial of necessary medical and psychiatric care to detainees, including but not limited to:

a. Medical Staffing Deficiencies – CoreCivic maintained chronic vacancies in key medical positions, including two FTE mental health practitioners, eight RN positions, and one FTE physician position, as documented in the ACA Reaccreditation Audit (Jan. 31 - Feb. 2, 2022).

b. Corporate-Controlled Medical Decisions – CoreCivic required that all significant medical decisions, including hospital transfers, be approved by an off-site corporate physician, delaying emergency care and resulting in preventable deaths.

c.  Failure to Train and Supervise – CoreCivic failed to adequately train medical and correctional staff in recognizing and responding to psychiatric crises and acute medical distress.

d.  Deficient Mental Health Care in Segregation – CoreCivic failed to ensure that medical staff completed required mental health evaluations for detainees in segregation, putting mentally ill detainees at risk of injury and death, as documented in the OIDO Report (Oct. 2023).

e.  Deliberate Indifference to Known Risks of Harm – CoreCivic was aware of prior deaths in the facility due to inadequate medical care, including detainees who died from drug overdoses after ingesting contraband smuggled into CCCC.

221.  These policies, customs, and deliberate failure to provide adequate medical care were the moving force behind Ramirez's death.

222.  As a direct and proximate result of Defendants' unconstitutional policies, Ramirez was denied necessary medical treatment, resulting in his preventable death in violation of his Fourteenth Amendment rights. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT V
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### 42 U.S.C. § 12132
### (Against Defendants CoreCivic, CMA, and Cibola General Hospital)

223.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

224.  Mr. Ramirez was a qualified individual with a disability under the ADA due to his schizophrenia and related mental health conditions, which substantially limited one or more major life activities.

225.  Defendants CoreCivic, CMA, and Cibola General Hospital are entities that receive federal funding and are subject to the ADA.

226.    Defendants discriminated against Mr. Ramirez by failing to provide reasonable accommodations for his disability, including proper medical and psychiatric treatment, housing accommodations, and safeguards against harm.

227.    Defendants CoreCivic and CMA placed Mr. Ramirez in segregation without accommodations and failed to ensure he received prescribed medication.

228.    Defendants CoreCivic and CMA denied Mr. Ramirez access to services, programs, and activities available to non-disabled detainees due to his disability.

229.    Defendant Cibola General Hospital discriminated against Mr. Ramirez by failing to provide meaningful medical treatment and needed intervention due to his incapacity and his status as a detainee in government custody.

230.    Defendants ignored his documented and obvious mental health needs.

231.    As a direct and proximate result of Defendants' violations of the ADA, Mr. Ramirez suffered discrimination, pain, suffering, and ultimately death. Plaintiff therefore seeks compensatory and punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 12205, and all other appropriate relief under 42 U.S.C. § 12132.

## COUNT VI
### VIOLATION OF THE REHABILITATION ACT, 29 U.S.C. § 794
### (Against Defendants CoreCivic, CMA, and Cibola General Hospital)

232.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

233.    Mr. Ramirez was an individual with a disability under the Rehabilitation Act due to his diagnosed mental illness.

234.    Defendants CoreCivic, CMA, and Cibola General Hospital receive federal funding and are required to comply with the Rehabilitation Act.

33

235.    Defendants discriminated against Mr. Ramirez by failing to provide reasonable modifications to their policies, practices, and procedures to ensure he received necessary medical care.

236.    Defendants failed to provide mental health services and accommodations necessary for Mr. Ramirez to safely navigate his confinement.

237.    As a result of Defendants' violations of the Rehabilitation Act, Mr. Ramirez suffered harm and ultimately died. Plaintiff therefore seeks compensatory damages, attorneys' fees and litigation costs pursuant to Section 505 of the Rehabilitation Act (29 U.S.C. § 794a).

## COUNT VII
## VIOLATION OF 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### (Against Defendants Cibola General Hospital and Joshua Larson, M.D.)

238.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

239.    At all relevant times, James Ramirez was a pretrial detainee whose constitutional rights were protected under the Fourteenth Amendment to the U.S. Constitution.

240.    Defendants Cibola General Hospital and Dr. Joshua Larson, M.D., were deliberately indifferent to Mr. Ramirez's serious medical needs, including his altered mental status, potential intoxication, and documented history of schizophrenia.

241.    Defendant Larson was aware that Mr. Ramirez was in an altered mental state and exhibited signs of psychosis, yet he failed to conduct necessary medical testing, including toxicology screens, bloodwork, or an electrocardiogram (ECG), which would have provided essential information for appropriate treatment.

242.    Instead of treating Mr. Ramirez's underlying medical and psychiatric emergency, Defendant Larson opted to administer excessive sedatives—including multiple doses of Ativan, Haldol, and Ketamine—without performing necessary medical assessments or ensuring safe follow-up care.

243.    Defendants' failure to conduct appropriate testing, medical stabilization, or psychiatric intervention resulted in Mr. Ramirez being chemically restrained rather than treated as a patient in need of urgent medical care.

244.    Defendants acted in concert with CoreCivic and CMA officials and staff to facilitate Mr. Ramirez's rapid discharge back to CCCC rather than provide him with constitutionally adequate medical care.

245.    Defendant Larson and Cibola General effectively functioned as state actors, as they treated Mr. Ramirez pursuant to a contractual or customary relationship with CoreCivic, thereby assuming responsibility for his medical care while under correctional custody.

246.    As a direct and proximate result of Defendants' deliberate indifference, Mr. Ramirez was returned to CCCC in a medically unstable condition, placed in solitary confinement without adequate monitoring, and ultimately suffered a preventable death.

247.    Defendants' conduct violated Mr. Ramirez's clearly established constitutional rights under the Fourteenth Amendment to receive adequate medical care as a pretrial detainee.

248.    Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT VIII
### VIOLATION OF 42 U.S.C. § 1983 – STATE-ACTION LIABILITY & CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS
### (Against Defendants Cibola General Hospital and Joshua Larson, M.D.)

249. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

250. Defendants Cibola General Hospital and Joshua Larson, M.D., acted jointly with CoreCivic and CCCC correctional officers to deprive Mr. Ramirez of his Fourteenth Amendment rights.

251. Defendant Larson was aware that Mr. Ramirez was a pretrial detainee in CoreCivic custody, yet he failed to act as an independent medical provider, instead prioritizing the interests of CoreCivic over those of his patient.

252. Rather than conducting independent medical assessments and ensuring appropriate treatment, Defendant Larson coordinated with CoreCivic staff to sedate Mr. Ramirez, rendering him further incapacitated and incapable of advocating for himself.

253. Defendants' actions were performed under color of law because they knowingly participated in the restraint and chemical sedation of a detainee without ensuring his medical safety, effectively acting in concert with CoreCivic as state actors.

254. Defendant Larson's deliberate indifference and cooperation with correctional authorities in restraining and discharging Mr. Ramirez without appropriate treatment constituted a conspiracy to deprive Mr. Ramirez of his constitutional rights.

255. The conspiracy between Defendants Cibola General Hospital, Dr. Larson, and CoreCivic officials deprived Mr. Ramirez of necessary and urgent medical intervention, contributing to his deteriorating condition and ultimate death.

256. As a direct and proximate result of Defendants' actions, Mr. Ramirez suffered prolonged distress, deprivation of medical care, and a preventable death.

257.    Defendants' actions violated Mr. Ramirez's clearly established constitutional rights under the Fourteenth Amendment, and Plaintiff seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT IX**
**VIOLATION OF 42 U.S.C. § 1983 – FAILURE TO PROVIDE REASONABLE ACCOMMODATIONS UNDER THE FOURTEENTH AMENDMENT**
**(Against Defendants Cibola General Hospital and Joshua Larson, M.D.)**

258.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

259.    Mr. Ramirez was a qualified individual with a disability under the Fourteenth Amendment due to his schizophrenia and documented history of psychosis.

260.    Defendants Cibola General Hospital and Dr. Larson knew or should have known about Mr. Ramirez's psychiatric disability, given his presentation of altered mental status and prior medical history.

261.    Despite this knowledge, Defendants failed to provide reasonable medical accommodations, including ensuring psychiatric consultation, continued medical observation, or appropriate monitoring of potential adverse drug interactions.

262.    Instead, Defendants chemically restrained Mr. Ramirez without his consent and discharged him back to CCCC, where he was at risk of serious harm due to his incapacitated state.

263.    Defendants failed to ensure Mr. Ramirez had the ability to participate in medical decision-making, violating his substantive rights under the Fourteenth Amendment's Due Process Clause.

264.    As a direct and proximate result of Defendants' actions, Mr. Ramirez was denied medical care and reasonable accommodations, leading to his deteriorating condition and ultimate death.

265.    Defendants' conduct violated clearly established constitutional protections under the Fourteenth Amendment, and Plaintiff seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## IV.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims triable to a jury.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Estate of James Ramirez, by and through Personal Representative Eugenio Mathis, respectfully requests that this Court enter judgment in Plaintiff's favor and grant the following relief:

1.    Compensatory Damages

   a.    For pain and suffering, mental anguish, emotional distress, and physical suffering endured by James Ramirez before and leading up to his death;

   b.    For medical expenses incurred due to Defendants' unconstitutional and unlawful conduct; and

   c.    For loss of enjoyment of life and the dignitary harms suffered by James Ramirez due to Defendants' violations of Mr. Ramirez's rights.

2.    Punitive Damages

a. Against individual Defendants acting under color of law in their personal capacities, pursuant to 42 U.S.C. § 1983, for their willful and malicious violations of James Ramirez's constitutional rights; and

b. Against private entities (CoreCivic, Correctional Medicine Associates, and Cibola General Hospital) for reckless and willful disregard of Mr. Ramirez leading to Mr. Ramirez's suffering and death.

3.    Attorneys' Fees and Costs

a. Pursuant to 42 U.S.C. § 1988(b), which provides for the recovery of reasonable attorneys' fees for prevailing plaintiffs in civil rights cases under 42 U.S.C. § 1983.

b. Pursuant to 42 U.S.C. § 12205, which allows for the recovery of attorneys' fees, litigation expenses, and costs for violations of the Americans with Disabilities Act (ADA).

c. Pursuant to 29 U.S.C. § 794a(b), which authorizes attorneys' fees for prevailing plaintiffs in actions brought under Section 504 of the Rehabilitation Act.

4.    Prejudgment and Post-Judgment Interest at the maximum legal rate allowed by law, to fully compensate for the injuries sustained.

5.    Any Further Relief as this Court deems just and proper under law.

Respectfully submitted,

COLLINS & COLLINS, P.C.

*/s/ Rebekah Wright*
Rebekah Wright
Francheska Bardacke
Parrish Collins
P. O. Box 506
Albuquerque, NM  87103
(505) 242-5958
rebekah@collinsattorneys.com

39

francheska@collinsattorneys.com
parrish@collinsattorneys.com

-and-

GUEBERT GENTILE PIAZZA & JUNKER P.C.
Elizabeth M. Piazza
P.O. Box 93880
Albuquerque, NM 87199
(505) 823-2300
epiazza@guebertlaw.com

***Attorneys for Plaintiff***

40