**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| Estate of JAMES RAMIREZ, Deceased, by EUGENIO MATHIS, Personal Representative of the Estate of James Ramirez, <br><br>     Plaintiff, <br><br> v. <br><br> CORECIVIC OF TENNESSEE d/b/a CORECIVIC, INC; CORRECTIONAL MEDICINE ASSOCIATES, P.C.; CIBOLA GENERAL HOSPITAL, INC., JOSEPH BOUNDS, RN, in his individual and official capacities; OFFICER WILLIAM SNODGRASS, in his individual and official capacities; OFFICER JASON BULLOCK, in his individual and official capacities; WARDEN ROBERT NILIUS, in his individual and official capacities; CHIEF MEDICAL OFFICER KEITH IVENS, MD, in his individual and official capacities; and JOSHUA LARSON, MD, in his individual and official capacities, <br><br>     Defendants. | No. 1:25-cv-00158-LF-KK |

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF RIGHTS UNDER THE UNITED STATES CONSTITUTION, AMERICANS WITH DISABILITIES ACT, AND THE REHABILITATION ACT**

Plaintiff Estate of James Ramirez, by and through Eugenio S. Mathis, personal representative of the estate ("Mr. Ramirez" or "Plaintiff"), by his attorneys, Guebert Gentile Piazza & Junker P.C., and Collins & Collins, P.C., and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202, brings this action (the "complaint") to redress violations of James Ramirez's substantive due process rights under the Fourteenth Amendment of the United States Constitution, and under the Americans with Disabilities Act and the Rehabilitation Act and alleges, based on information and belief, as follows:

1

**<u>PRELIMINARY STATEMENT</u>**

CoreCivic and Cibola General Hospital Corp., acting through their respective employees, staff, and agents, knew that Mr. Ramirez was diagnosed and suffered from schizophrenia with paranoia, including prior hospitalizations. On February 14, 2022, Mr. Ramirez underwent an acute and severe psychiatric emergency. For nearly six hours, CoreCivic correctional officers held down Mr. Ramirez while other CoreCivic employees, staff, and agents watched. While he was being physically restrained, CoreCivic medical personnel did not examine or otherwise provide medical treatment to Mr. Ramirez. CoreCivic defendants deliberately and recklessly ignored an emergent medical crisis. Finally, nearly six hours later, Mr. Ramirez was transferred to Cibola General Hospital. Unfortunately, James Ramirez's psychiatric condition continued to be ignored. Despite knowing of Mr. Ramirez's self-harming behavior and history of schizophrenia, Defendant Joshua Larson, Cibola General's emergency room physician, only assessed Mr. Ramirez's physical injuries. Dr. Larson made no effort to assess Mr. Ramirez's psychiatric state. Nor did Dr. Larson order studies of Mr. Ramirez's blood chemistry. to explore other potential causes of James's bizarre behavior. Instead, without his consent, Mr. Ramirez was chemically restrained with a barrage of powerful sedatives—Ativan, Haldol, and finally Ketamine. When wound care and imaging were complete, Mr. Ramirez was not held for observation to ensure that he did not experience adverse effects from the cocktail of sedatives he had been injected with. Instead, Mr. Ramirez was discharged back to Cibola County Correctional Center ("Correctional Center" or "CCCC"). Once there, Dr. Daniel Ivens directed staff to transfer Mr. Ramirez by gurney to an isolated, solitary cell with no medical oversight. Within hours, Mr. Ramirez died alone under circumstances that remain uncertain.

Mr. Ramirez's injuries, and prolonged pain and suffering reflect CoreCivic's, CMA's, Warden Nilius, and Dr. Ivens' widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care. His injuries and suffering were also caused, in part, by Cibola General Hospital's longstanding pattern and practice of responding with deliberate indifference to the failures of its medical employees, staff, and agents to provide constitutionally adequate medical care to those in custody at the Correctional Center. The actions and inactions of Defendants violated Mr. Ramirez's substantive due process rights secured by 42 U.S.C § 1983 under Fourteenth Amendment to the United States Constitution. As an individual with a disability, Mr. Ramirez's rights were violated under the Americans with Disabilities Act and the Rehabilitation Act when defendants failed to provide reasonable accommodations for his diagnosed schizophrenia and discriminated against him on the basis of his condition.

## I. PARTIES, JURISDICTION, & VENUE

1. This is a civil action authorized by: 42 U.S.C. § 1983 to redress the deprivation, under color of law, of substantive due process rights secured by the Fourteenth Amendment of the United States Constitution, and for discrimination on the basis of disability by 42 U.S.C. § 12132 and 29 U.S.C. § 794, Section 504 of the Rehabilitation Act of 1973,.

2. Subject matter jurisdiction is conferred by 28 U.S.C. § 1331.

3. The United States District Court of New Mexico is an appropriate venue under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in New Mexico.

4. James Ramirez was a pre-trial detainee at Cibola County Correctional Center (CCCC) under the care and custody of CoreCivic when he died in custody at the age of 28. Plaintiff Eugenio Mathis is a resident of San Miguel County, New Mexico, and is the personal

representative of the Estate of James Ramirez. *See In re: James Ramirez*, New Mexico Fourth Judicial District Court, Cause No. D-412-CV-2022-00106. Plaintiff brings this action on behalf of the Estate of James Ramirez.

5.      Defendant CoreCivic of Tennessee, d/b/a CoreCivic, Inc. (CoreCivic), is a private, for-profit corporation that receives federal funding. CoreCivic was specifically organized to operate, staff, and manage prison facilities. For purposes of this claim, CoreCivic operated out of Milan, Cibola County, New Mexico, at the Cibola County Correctional Center. At all relevant times, Defendant CoreCivic employed, retained, trained, and exercised direct control over the individually named Defendants who were employees, contractors, and/or agents of CoreCivic. Upon information and belief, CoreCivic is headquartered in Brentwood, Tennessee.

6.      Defendant Correctional Medicine Associates, P.C. (CMA), is a private, for-profit corporation that receives federal funding. Upon information and belief, CMA is organized as a subsidiary of, partner to, or joint venture with CoreCivic to employ certain medical staff to provide direct care to individuals in CoreCivic's custody and to supervise CoreCivic medical staff in the provision of care to these individuals. Upon information and belief, CMA and CoreCivic share the same Tennessee address as their principal place of business. At all relevant times, Defendant CMA employed, retained, trained, and exercised direct control over the individually named Defendants who were employees, contractors, and/or agents of CMA.

7.      Defendant Cibola General Hospital, Inc., is a domestic for-profit corporation that receives federal funding. Cibola General's principal place of business is 1016 E. Roosevelt Ave., Grants, New Mexico. At all relevant times, Cibola General operated, supervised, directed, and controlled Cibola General Hospital (Cibola General) in Grants, New Mexico.

8.      Defendant Robert Nilius was, at the time of James Ramirez's death, Warden of CCCC. Defendant Robert Nilius, in his official and individual capacities as Warden of CCCC had direct knowledge and supervisory responsibility regarding the serious medical condition and disability-related needs of inmate James Ramirez. Specifically, Defendant Nilius was informed via email communication that Mr. Ramirez had returned to the facility following hospitalization and required ongoing medical attention. This email notification, upon information and belief, explicitly or implicitly made Defendant Nilius aware of Mr. Ramirez's vulnerable condition, medical needs, and disability-related limitations. Despite actual knowledge of Mr. Ramirez's medical and disability-related needs, Defendant Nilius failed to act to ensure appropriate medical care, disability accommodations, and humane treatment, allowing Mr. Ramirez to be subjected to inappropriate and unnecessary physical restraint. Defendant Nilius's failure to intervene or take corrective action directly contributed to the deprivation of Mr. Ramirez's substantive due process rights under the Fourteenth Amendment. Further, as Warden, Defendant Nilius had ultimate authority and responsibility under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a), to ensure that inmates with disabilities received reasonable accommodations. Upon information and belief, Defendant Nilius failed to institute or enforce policies and procedures to provide Mr. Ramirez with necessary disability accommodations, especially when placing Mr. Ramirez in isolation or restrictive housing. This failure directly caused or contributed to the harm and ultimate injury suffered by Mr. Ramirez, evidencing intentional discrimination or deliberate indifference to the rights of inmates with disabilities, including Mr. Ramirez.

9.      Defendant Correctional Officer William Snodgrass was, at the time of James Ramirez's death, a Captain and Shift Supervisor employed by CoreCivic at CCCC. At all times

material to this lawsuit, Defendant Snodgrass had a duty to ensure that detainees housed under his supervision, including James Ramirez, were safe, free from unwanted and unnecessary pain and suffering, that they received medical care if the medical condition was sufficiently serious that it would have been obvious that even a lay person would easily recognize the necessity for a doctor's attention, and that reasonable accommodations were provided for detainees in custody. Defendant Snodgrass also had a duty to ensure Mr. Ramirez was not in constant pain and suffering, and to ensure that the lack of medical care would not result in an increase in his injuries. Finally, as a supervisor of other correctional officers and staff, Defendant Snodgrass had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez. Defendant Snodgrass is sued in his individual capacity for failing to ensure Mr. Ramirez received timely medical attention, despite being aware of his deteriorating condition and medical needs, and in his official capacity as an employee of CoreCivic for violating Mr. Ramirez's constitutional rights by failing to ensure Mr. Ramirez received the necessary medical care during his incarceration.  The failure to enforce adequate protocols contributed to Mr. Ramirez's prolonged pain and suffering and eventual death.

10.    Defendant Jason Bullock was, at the time of James Ramirez's death, a supervising officer employed by CoreCivic and working at CCCC. At all times material to this action, Defendant Bullock had a duty to ensure that detainees housed under his supervision, including James Ramirez, were safe, free from unwanted and unnecessary pain and suffering, and that they received medical care if the medical condition was sufficiently serious that it would have been obvious that even a lay person would easily recognize the necessity for a doctor's attention.

Defendant Bullock also had a duty to ensure detainees including Mr. Ramirez were not in constant pain and suffering, that the lack of medical care would not result in an increase in his injuries, and that reasonable accommodations were provided. Finally, as a supervisor of other correctional officers and staff, Defendant Bullock had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation of or failure to provide reasonable accommodations to any detainee, including James Ramirez. Defendant Bullock is sued in his individual and official capacities.

11.    Defendant Medical Officer Joseph Bounds, RN, was, at the time of James Ramirez's death, employed by CoreCivic and working as a supervising nurse at CCCC. At all times material to this action, Defendant Bounds had a duty to ensure that detainees treated under his supervision, including James Ramirez, received medical care that was objectively reasonable. As a supervisor of medical officers and staff, Defendant Bounds had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez. He is sued in his individual capacity for his personal failure to transfer Mr. Ramirez to a higher level of care, among other things. He is sued in his official capacity for failures to ensure that detainees treated under his supervision, including Mr. Ramirez, received medical care that was objectively reasonable and constitutionally adequate. Additionally, Defendant Bounds denied Mr. Ramirez access to services, programs, and activities available to non-disabled detainees due to his disability, discriminated against Mr. Ramirez by failing to provide meaningful medical treatment and needed intervention due to his incapacity

7

and his status as a detainee in government custody, and ignored his documented and obvious mental health needs.

12.     Upon information and belief, Defendant Keith Ivens, MD, was, at the time of James Ramirez's death, an employee and agent of CoreCivic and/or CMA. Upon information and belief, Defendant Ivens was the Chief Medical Officer of CoreCivic and the "on-site" medical doctor supervising the medical staff at CCCC. Additionally, upon information and belief, Ivens was responsible for approving "clinical pathways for various diseases and medical policies" by the medical staff at CCCC. At all times material to this action, Defendant Ivens had a duty to ensure that detainees treated under his supervision, including James Ramirez, received medical care that was objectively reasonable. As a supervisor of medical officers and staff, Defendant Ivens had a duty to 1) avoid the creation or enforcement of any policy that caused constitutional violations to detainees, including James Ramirez; and 2) act when he learned of an ongoing constitutional violation pertaining to any detainee, including James Ramirez. He is sued in his individual capacity for his personal failure to approve Mr. Ramirez's transfer to a higher level of care.  He is also sued in his official capacity as Chief Medical Officer for CoreCivic and/or CMA for failures to ensure that detainees treated under his supervision, including Mr. Ramirez, received medical care that was objectively reasonable and constitutionally adequate.

13.     Defendant Joshua Larson, MD, was, at the time of James Ramirez's death, a medical doctor at Cibola General Hospital's emergency department. Upon information and belief, Defendant Larson resides in New Mexico. Defendant Dr. Joshua Larson is sued in his individual capacity for his failure to provide timely and appropriate medical care to Mr. Ramirez. Despite clear indications of serious medical and psychiatric issues, Dr. Larson discharged Mr. Ramirez back to the facility without further evaluation or treatment. His actions amounted to deliberate

8

indifference to Mr. Ramirez's ongoing life-threatening condition, directly contributing to his death. Defendant Larson is sued in his official capacity as an employee of Cibola General Hospital. The hospital's policies regarding the treatment and discharge of incarcerated individuals were grossly inadequate, and Dr. Larson, acting under these policies, discharged Mr. Ramirez despite an ongoing emergent medical and psychiatric crisis.

14.    At all relevant times, the individual Defendants acted under the color of law within the scope of their duties and employment.

15.    All individual defendants are named in both their individual and official capacities, as specified above

## II.    FACTUAL BACKGROUND

### *Duties of a Private Detention Facility*

14.    Prison corporations that operate private detention facilities by agreement with the federal, state, or local governments remain subject to constitutional, statutory, and contractual obligations.

15.    Private detention facilities must maintain a secure facility that prevents violence and harm to staff and incarcerated individuals.

16.    Private detention facilities must implement policies to protect individuals from inmate-on-inmate violence, excessive use of force by staff, and self-harm risks.

17.    Private detention facilities must train staff in segregation procedures, use-of-force policies, de-escalation tactics, and emergency response protocols.

18.    Private detention facilities must provide sufficient supervision and staffing levels to prevent harm, per contractual and constitutional requirements.

19. Private detention facilities must deliver constitutionally adequate medical and mental health care in compliance with the Fourteenth Amendment for pretrial detainees.

20. Private detention facilities must adhere to national standards of medical care, including access to physicians, nurses, and specialists when needed.

21. Private detention facilities must ensure timely response to medical emergencies and chronic care needs, including mental illness.

22. Private detention facilities must maintain proper medical recordkeeping and ensure continuity of care.

23. Private detention facilities must adhere to federal laws, such as the Americans with Disabilities Act (ADA) to ensure accommodations and protection from abuse.

24. Private detention facilities must provide access to grievance procedures and legal resources.

25. A significant portion of incarcerated individuals have mental health conditions, including severe disorders such as schizophrenia, bipolar disorder, and major depression.

26. Medical providers in any correctional facility have a duty to screen, diagnose, and provide timely, adequate mental health care, including crisis intervention, suicide prevention, chronic disease management, and continuity of care.

*Cibola County Correctional Center*

27. CoreCivic, a private for-profit prison corporation owns and operates the Cibola County Correctional Center (CCCC), located in Milan, New Mexico, under lease by Cibola County.

28.    CCCC was originally under contract with the Federal Bureau of Prisons (BOP) to house federal inmates. However, in 2016, the BOP terminated its contract with CCCC due to concerns over inadequate medical care and multiple inmate deaths.

29.    CCCC has a capacity of approximately 1,145 individuals. Most individuals housed at CCCC are under the jurisdiction of Cibola County, the U.S. Marshals Service, U.S. Immigration and Customs Enforcement (ICE), or The Pueblo of Santa Ana.

30.    Between January 31 and February 2, 2022, the American Commission on Accreditation (ACA) conducted a scheduled evaluation of CCCC. The findings of the ACA committee revealed multiple healthcare staff vacancies, including two FTE mental health practitioners, eight RN positions, and one FTE physician position. *See Reaccreditation Audit*, Commission on Accreditation for Corrections Standards Compliance (Jan. 31 – Feb. 2, 2022).

31.    The ACA committee noted that clinical management of medical services at CCCC is provided by a "corporate physician who approves clinical pathways for various diseases and medical policies." ACA's report further explained that this "corporate medical director" also happened to be both CCCC's physician, with 24-40 hours per week devoted to their position at CCCC.

32.    Upon information and belief, this "on-site physician" in January through February 2022 was Defendant Keith Ivens, MD.

33.    CoreCivic's practice of requiring a corporate physician's approval for hospital transfers, such as Dr. Ivens' denial of urgent hospital care for Mr. Ramirez, directly resulted in preventable suffering and death.  By enforcing corporate medical control over critical decisions, CoreCivic failed to provide timely care and prioritized profit over patient safety, reflecting a widespread failure to meet constitutional standards of medical care.

34.    CoreCivic maintained a policy of restricting access to outside medical care, even when urgent medical transfers were necessary. Despite clear signs of a serious medical condition, CoreCivic medical personnel delayed referring Mr. Ramirez for emergency care. Dr. Ivens, acting under CoreCivic's policies, refused to authorize an urgent transfer to a hospital, which led to the worsening of Mr. Ramirez's condition, ultimately resulting in his preventable death.

35.    In August 2022, a federal oversight office conducted an unannounced inspection of CCCC. Results of the unannounced inspection were released in an October 2023 report ("OIDO Report").[1]

36.    The OIDO Report revealed CCCC's medical staff had a 36 percent vacancy rate as of August 2022. According to the Report, the low staffing levels likely contributed to deficiencies found in the provision of medical services to detainees, including delays in distributing prescribed medications and improper monitoring and follow-up for prescribed psychiatric medications.

37.    CoreCivic's chronic vacancies in critical medical positions (e.g., eight nursing positions, one physician position, two mental health practitioners) across its facilities as reported by the ACA and OIDO, created a pattern of insufficient care that affected the timely diagnosis and treatment of serious medical conditions.  This failure to adequately staff resulted in dangerous delays in emergency response, inadequate treatment for chronic illnesses, and failure to provide basic care, leading to the needless suffering and death of detainees such as Mr. Ramirez.

---

[1] *See OIDO-23-013 Cibola County Correctional Center August 9-11, 2022*, David D. Gersten Acting Ombudsman Office of the Immigration Detention Ombudsman (Oct. 23, 2023), at https://www.dhs.gov/sites/default/files/2023-12/23_1013_OIDO%20_Final-Inspection-Report-Cibola-County-Correctional-Center.pdf. Although the inspection was performed by an entity charged with oversight of ICE detainees, the findings regarding medical staffing, pharmaceutical services would apply to other detainees, since these services are provided by the same staff. Arguably, the deficiencies spotted in segregation procedures also apply to other detainees, since the standard procedures appear to be consistent, regardless of detainee status and CCCC's internal segregation policies do not appear to differentiate between detainees.

38. CoreCivic's decision to maintain staffing levels below national standards (as confirmed by the American Correctional Association (ACA) audit) resulted in severe delays in addressing detainees' medical complaints. As CoreCivic maintained these inadequate staffing levels, Mr. Ramirez's health deteriorated rapidly, resulting in his avoidable suffering and death.

39. CCCC's procedures for placement of detainees in segregation were also found to be deficient by the inspectors. Specifically, the inspectors found that CCCC medical staff failed to complete necessary forms for detainees placed in segregation, and facility management failed to ensure completeness and correctness of those forms. According to the OIDO Report, the failure to complete this documentation puts detainees in danger of inappropriate placement and retention in segregation.

40. Finally, the OIDO report calls out CCCC for lapses in training and documentation, particularly in areas of pharmaceutical medication handling, medical records, and documentation of staff credentials and certifications.

41. CoreCivic's failure to properly train medical staff contributed to deliberate indifference to Mr. Ramirez's medical needs. Despite his ongoing medical and mental health crisis, staff lacked the necessary training to identify the symptoms. Mr. Ramirez's need for medical care were ignored or met with recklessly deficient responses, demonstrating the incompetence of medical personnel hired by CoreCivic to provide adequate care to detainees.

***Prevalence of Drugs at CCCC***

42. In recent years, CCCC has become notorious for drug trafficking and widespread drug use among inmates.

43.    CCCC's issues with drugs became so severe that federal judges in the District of New Mexico and the United States Marshals Service and brought their concerns to the United States Attorneys' Office and the Federal Bureau of Investigation (FBI).

44.    The FBI Albuquerque Division Violent Gang Task Force investigated the CCC and uncovered a complex and lucrative drug trafficking network within CCCC.

45.    Specifically, members of prison gangs at CCCC had been working with associates outside of prison, along with CCCC employees, to smuggle drugs and other contraband into CCCC.

46.    According to a search warrant affidavit, FBI Special Agent Jordan Spaeth found that the CCCC's drug problem was a "startling anomaly" among New Mexico's detention centers due to the "sheer volume of controlled substances being trafficked within the facility."

47.    In 2021, multiple instances were recorded in which tennis balls containing drugs were thrown over the fence of CCCC from outsiders. On at least one occasion, inmates were able to recover the drugs. It is believed that because of the proximity of CCCC to public roadways, this type of activity is common, but usually goes undetected.

48.    Upon information and belief, CCCC employees have been responsible for drugs and contraband entering CCCC as well.

49.    On August 29, 2023, former CCCC Correction Officer (CO) Dennis Dean Garcia was sentenced to 24 months of imprisonment followed by three years of supervised release for attempting to provide contraband in prison.[2]

---

[2] *See* Press Release, *Former USMS Detention Officer Sentenced for Attempt to Provide Contraband in Prison*, U.S. Dept. of Justice, Office of the Inspector General (Aug. 29, 2023), https://oig.justice.gov/news/press-release/former-usms-detention-officer-sentenced-attempt-provide-contraband-prison.

50.     Garcia, who was employed as a CO at CCCC from January 2019 until February 22, 2021, had been investigated after monitors of surveillance video at CCCC observed Garcia remove something from his pocket and place it in a storage room. The item contained 104 grams of methamphetamine.[3]

51.     During the FBI's investigation of CCCC, investigators were told by approximately two dozen sources from within the facility that certain corrupt COs would regularly smuggle drugs and other contraband into CCCC for inmates.

52.     One source reported knowing a CO who would hide drugs in his boot to bring them into CCCC. The CO would then deliver the drugs to an inmate by dropping the package into the cell during a "search," outside the view of surveillance cameras.

53.     FBI investigators also learned of a former captain and shift supervisor at CCCC who had been actively involved in drug trafficking while at CCCC. Allegedly, the captain worked with several porters—inmates who would distribute drugs around the facility. When drugs were found in an inmate's cell by COs, this captain directed the officers to refrain from field testing the drugs and then deleted photo and video evidence of the drugs.

54.     The transfer of drugs and other contraband is sometimes achieved by hiding the contraband inside food carts. CCCC facilitates distribution of contraband by permitting the free movement of carts between pods without supervision.

---

[3] *See* Press Release, *Former corrections officer arraigned on drug trafficking and contraband charges*, U.S. Attorney's Office, District of New Mexico (Feb. 3, 2022), https://www.justice.gov/usao-nm/pr/former-corrections-officer-arraigned-drug-trafficking-and-contraband-charges.

55.    On November 1, 2024, the U.S. Attorney's Office, District of New Mexico, announced a major "dismantling" of the drug trafficking network associated with CCCC.[4] The joint operation included multiple search warrants, indictments, and arrests.

56.    On January 25, 2025, Michael "Gomer" Ernest Garcia was arrested in connection with the FBI investigation of drug trafficking at CCCC.[5]

57.    Upon information and belief, multiple individuals in CCCC custody have lost their lives in recent years due to drugs that were brought into CCCC illegally. In June 2021, a male detainee was discovered dead in his cell at CCCC. The Office of Medical Investigator (OMI) determined that this detainee died from the toxic effects of fentanyl, methamphetamine, and morphine. On November 14, 2021, Jasmine Williams was discovered dead in her cell. Her death was also determined to be caused by the toxic effects of fentanyl and other drugs.

*CMA*

58.    Defendant Correctional Medicine Associates, P.C. (CMA) is a private, for-profit corporation that receives federal funding.

59.    Defendant CMA advertises that it "designs, builds, manages, and operates prisons, jails, detention centers and residential reentry centers on behalf of the Federal Bureau of Prisons, Immigration and Customs Enforcement, [and] the United States Marshals Service."

60.    CMA's actions and their employees' actions, and lack thereof, are consistent with its business model.  For-profit prison companies are some of the most harmful, exploitative

---

[4] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Target Drug Trafficking Operation Linked to Federal Correctional Facility,* U.S. Attorney's Office, District of New Mexico (Nov. 1, 2024), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-target-drug-trafficking-operation-linked-federal-0.
[5] *See* Press Release, *U.S. Attorney's Office, FBI and USMS Disrupt Contraband Operation at Cibola County Correctional Center with Arrest*, U.S. Attorney's Office, District of New Mexico (Jan. 25, 2025), https://www.justice.gov/usao-nm/pr/us-attorneys-office-fbi-and-usms-disrupt-contraband-operation-cibola-county-correctional.

16

institutions in our society. These companies, like CMA, generate billions of dollars in profit by, among other things, cutting costs wherever possible and forcing people in their care to suffer.

61.    CMA, also known as Wellpath, has been involved in numerous lawsuits which have included allegations of contributing to jail deaths and inadequate medical care.

62.    A 2019 CNN investigation found that in lawsuits filed between 2014 and 2018, CMA (formerly Correct Care Solutions) was accused of contributing to more than 70 jail deaths.

63.    CMA, then known as Correct Care Solutions, was sued at least 1,395 times, according to the Project on Government Oversight, although that number is believed to be higher.

64.    CMA provides incentives to curb costs and hospital trips for inmates and is part of a multi-billion dollar industry with little public scrutiny.

65.    CMA institutes policies and procedures that intentionally cut costs, including but not limited to, reprisal against employees or staff for ordering medical tests, or purchasing medications, to hiring unqualified providers, and intentionally understaffing facilities.

66.    Defendant Ivens was an employee and / or agent of CMA during the time that Mr. Ramirez was incarcerated at CCCC.

67.    At that time, there was a policy and procedure in place that no inmate could be sent for medical treatment, even in emergency situations, without Defendant Ivens' authority.

68.    This policy and procedure, instituted by CMA and ratified by CCCC, was implemented by Defendant Ivens, and was intended to limit medical treatment for inmates, thereby reducing costs to CMA.

69.    Defendant Ivens implemented and upon information and belief, helped create, the policies and procedures which result in the denial of medical care to inmates as a cost saving measure.

17

70.     CMA failed to ensure Defendant Ivens, among others, was qualified and skilled for his position.

71.     CMA intentionally employed inexperienced personnel in the facilities in which it operated, as part of its plan to reduce costs by not providing appropriate, or adequate medical care.

72.     CMA has known that its policies and procedures result in deficient medical care, which is the intended result of those policies and procedures.

73.     CMA was deliberately indifferent to the needs of Mr. Ramirez, failed to provide appropriate and adequate medical care, resulting and / or contributing to Mr. Ramirez's death.

*James Ramirez*

74.     James Ramirez was a pre-adjudication detainee housed at CCCC from September 7, 2021, until his death at age 28 on February 15, 2022.

75.     Mr. Ramirez had a documented history of schizophrenia with paranoia, including auditory hallucinations and prior hospitalizations.

76.     Mr. Ramirez's schizophrenia was documented to substantially limit his ability to organize his thoughts, retain information, communicate, and interact with others, and regulate his mood and emotions. (42 U.S.C. § 12102(2)).

77.     Mr. Ramirez required anti-psychotic medication. Without medication, Mr. Ramirez would suffer audial hallucinations. Specifically, Mr. Ramirez reported he would hear the voice of the "Predator."

78.     In August 2021, Mr. Ramirez sustained multiple gunshot wounds during an incident that resulted in several bullets or bullet fragments being lodged in his body. These injuries caused chronic pain and discomfort and likely exacerbated his psychiatric conditions.

79.    Following a hospitalization for his injuries, and before being transferred to CCCC, Mr. Ramirez was on a mental health "Hold" at the Bernalillo County Metropolitan Detention Center ("MDC"), where he was assessed and started on psychiatric medications.

80.    Upon Mr. Ramirez's initial intake at CCCC, CoreCivic and Correctional Medicine Associates and their respective employees, including Defendant Keith Ivens, MD, were made aware of Mr. Ramirez's history of schizophrenia, auditory hallucinations, paranoia, anxiety, difficulty organizing thoughts, substance abuse disorder, asthma, recent injuries, ongoing wounds, and his associated care needs.

81.    When Mr. Ramirez was released from MDC on September 7, 2021, he had been provided with several days' worth of his psychiatric medications to ensure he had continuity in his medication regimen.

82.    When Mr. Ramirez underwent CoreCivic's "Comprehensive Mental Health Evaluation" on September 9, 2021, it was noted that Mr. Ramirez had not received his psychiatric medications for three days at that point.

83.    On September 10, 2021, CCCC tele-health psychiatrist Anna Ortiz, MD, prescribed Mr. Ramirez multiple psychiatric medications, but there is little evidence of a full psychiatric evaluation of Mr. Ramirez.

84.    On December 20, 2021, forensic psychologist Julie Brovko, Ph.D., requested Mr. Ramirez' medical and mental health records as part of a court-ordered evaluation of Mr. Ramirez's competency to stand trial.[6]

---

[6]When Mr. Ramirez was detained in California years prior, he was deemed not competent to stand trial and was Mr. transferred to Patton State Hospital for mental health treatment.

85.     Years prior, Mr. Ramirez had been found to be unable to participate in legal proceedings because of his mental illness.

86.     On December 20, 2021, Dr. Ortiz responded to Dr. Brovko's inquiry, representing that Mr. Ramirez was not having any hallucinations, was feeling well and in a stable mood, and was "without psychosis."

87.     However, Dr. Ortiz fails to report to Dr. Brovko that Mr. Ramirez had been reporting that he feared for his life due to threats from other detainees. These "grievances" were taken at face value, prompting security staff to transfer Mr. Ramirez for his "safety."

88.     Dr. Ortiz and the mental health staff at CCCC were either unaware of these grievances or did not consider them as indicators that Mr. Ramirez may have been experiencing psychosis.

89.     Even when a complaint was investigated by CCCC staff, and Mr. Ramirez's fears were deemed unsubstantiated and dismissed as "paranoia," Mr. Ramirez was not referred to mental health providers for a psychiatric re-evaluation.

90.     In January 2022, United States District Judge Martha Vazquez suspended criminal proceedings against Mr. Ramirez and ordered that the government make arrangements for Mr. Ramirez to receive psychiatric care at a Bureau of Prisons (BOP) facility.

91.     That same month, Mr. Ramirez again reported to COs that he feared for his life. Despite James' history of schizophrenia and hallucinations, no mental health or psychiatric re-evaluation was ordered for Mr. Ramirez.

92.     On or about February 9, 2022, Mr. Ramirez was placed in CCCC "segregation" or solitary confinement.

93.    CoreCivic confined and kept Mr. Ramirez in a solitary cell without referring him for a single mental health risk assessment.

[Proceed to following page.]

10-101A

## USMS CONFINEMENT RECORD (CR)

| Facility Name | Cibola County Correctional Center | | | | | |
|---|---|---|---|---|---|---|
| Detainee Name | Ramirez, James | | | Detainee Number | 63570509 | |
| Date of Placement | 2/9/2022 | Time | 1400 | Original Housing | 800B | |
| Placement Ordered By | S/S DELGARITO | | | Tentative Release Date | N/A | |

I. RESTRICTIVE HOUSING STATUS - INITIAL (Check One):

☐ Disciplinary Segregation  ☒ Administrative Segregation – Protective Custody  ☐ Administrative Segregation-Preventive

☐ Administrative Segregation- Investigation  ☐ Administrative Segregation – Involuntary PREA Placement

*ANY TIME A DETAINEE'S STATUS CHANGES, ANOTHER 10-101A MUST BE COMPLETED*

II. REASON FOR PLACEMENT (Check One):

☐ Disciplinary Infraction of offenses for which disciplinary segregation is an approved sanction

☒ Separation from general population for the purpose of protection from other detainees for reason of personal safety

☐ Poses a serious threat to life, property, self, staff, or other detainees

☐ Poses a threat to the security of the orderly operation of the facility

☐ Administrative order from the Chief of Security or higher authority or contracting agency

☐ Preventive Measures to ensure detainee and staff safety

☐ Investigation only after officials conclude "poses a threat to life, property, self, staff, other detainees and public.

☐ Involuntary PREA Placement – No alternative means of separation can be arranged (note reason why below)

Reason why no alternative means of separation or other housing option could not be arranged _____

III. SPECIAL CONDITIONS/PRECAUTIONS: (**If "YES", you must explain. Attach additional sheets, if necessary.)

Recreation/Exercise Requirements: ☒ NO ☐ YES:_____

Restrictions on Personal Property (imposed by the placing authority for cause): ☒ NO ☐ YES:_____

Known Assault Risk: ☒ NO ☐ YES: _____

Modified Restraint Procedures: ☒ NO ☐ YES:_____

Medical/Mental Health Care Personnel Conduct Risk Assessment Prior to Placement in Restrictive Housing: ☒ NO ☐ YES:____

Disability: ☒ NO ☐ YES: _____

Special Diet (medical or religious): ☒ NO ☐ YES:_____

Medication Requirements (current prescriptions): ☒ NO ☐ YES:_____

Additional Search Requirements: ☒ NO ☐ YES:_____

Other: ☒ NO ☐ YES:_____

IV. Is the detainee's behavior abnormal, aggressive, violent, or unusual? ☒ NO ☐ YES *If "YES":_____

V. ADMINISTRATIVE REVIEW: This section must be completed for initial placement, not required for a change in status. The review must be conducted within 24 hours of placement by the Chief of Security/Unit Management or higher authority.

☒ Approved ☐ Denied ☐ Modified (Provide Comment):_____

| Printed Name | L. M. G. | Title | /o> | | |
|---|---|---|---|---|---|
| Signature | | Date | 2-10-22 | Time | 1300 |

VI. RELEASE:

---

10-101C

## Multi-Disciplinary Committee CONFINEMENT REVIEW

| Facility Name | Cibola County Correctional Center | | |
|---|---|---|---|
| Detainee Name | Ramirez, James | Detainee Number | 63570509 |
| Date of Review | 2/10/22 | Date of Placement | 2/10/2022 |

I. CURRENT STATUS (Check One):

☐ Disciplinary Segregation ☐ Administrative Segregation – Protective Custody ☐ Administrative Segregation-Investigation
☒ Administrative Segregation ☐ Administrative Segregation – Involuntary PREA Placement

II. Was the detainee present for the review? ☐ Yes ☐ No Ramirez, James

III. Disciplinary Infraction at level to warrant D/S is an approved sanction? ☒ Yes ☐ No

IV. Was Less Restrictive Housing options reviewed? ☒ Yes ☐ No

V. Has the detainee been seen by health services staff daily? ☒ Yes ☐ No If no, explain below:

_____

VI. Was the detainee identified with mental health illness ☐ Yes ☒ No If so did mental health staff conduct a review prior to placement in restrictive housing. ☐ Yes ☒ No has mental health practitioner conduct a face-to-face clinical contact at least weekly. ☐ Yes ☐ No_____

22

94.    As evident from CoreCivic's confinement paperwork, excerpted on the prior page, Mr. Ramirez's psychiatric diagnosis, paranoia, and mental health history were specifically denied by CoreCivic staff.

95.    Records from Mr. Ramirez's isolation paint a bleak picture of his existence in solitary. He was never recorded as being let out for any form of recreation. From February 9 through 12, 2022, Mr. Ramirez was not recorded as showering or receiving clean clothes or linens. No activity whatsoever is recorded for February 13, 2022, suggesting James may not have even eaten anything that day.

96.    Medication administration records show that for most of his time in solitary confinement, Mr. Ramirez did not receive his prescribed antipsychotic medications. (Mr. Ramirez should have received medications twice daily, but no delivery was recorded February 9, the morning of February 10, any time February 12, or the morning of February 13, 2022.)

97.    CoreCivic and CMA and their respective employees and agents never provided Mr. Ramirez with reasonable accommodations or protections in order for Mr. Ramirez to safely be placed in segregation or confined housing at CCCC.

98.    Upon information and belief, Mr. Ramirez's mental and physical health were negatively impacted by his confinement to a segregated, solitary cell from February 9 through the morning of February 14, 2022.

**February 14, 2022**

*Morning (~36 hours before Mr. Ramirez's death)*

99.    Upon information and belief, sometime in early February 2022, CoreCivic received an order from the U.S. Marshals Service (USMS) for Mr. Ramirez to be transferred out of CCCC for eventual transfer to a BOP hospital for mental health treatment.

100.    This transfer was scheduled for the morning of February 14, 2022.

101.    Upon information and belief, in the early morning hours of February 14, 2022, Mr. Ramirez was discharged from his solitary cell and taken to CCCC's receiving and outgoing station to await transfer by USMS agents.

102.    Nurse Pena was tasked to perform a final medical clearance of Mr. Ramirez prior to his transfer.

103.    Nurse Pena observed that Mr. Ramirez was acting very strangely, repeatedly stating that he just wanted to go to sleep.

104.    Nurse Pena suspected Mr. Ramirez had been exposed to and was under the influence of an unknown substance.

105.    Nurse Pena brought her concerns about Mr. Ramirez to Defendant Bullock.

106.    Nurse Pena requested that Defendant Bullock perform a urine drug screen to evaluate Mr. Ramirez for possible intoxication.

107.    Defendant Bullock refused to facilitate a urinalysis on Mr. Ramirez to test for illicit substances in Mr. Ramirez's system.

108.    Upon information and belief, Defendant Bullock told Nurse Pena that he would not order or facilitate a urinalysis request because his shift was over and he was "out of there."

109.    Mr. Ramirez could not be cleared for transfer out of CCCC due to his condition.

110.    Instead, at or around 7 AM, Mr. Ramirez was placed in the CCCC Medical Unit.

111.    Medical staff observed that Mr. Ramirez began exhibiting severe distress, slurred speech, and loss of coordination.

112.    Mr. Ramirez was exhibiting signs consistent with schizophrenic-related psychosis.

24

113.   As Mr. Ramirez's physical and psychological condition deteriorated, he was moved to a cell in the Medical Unit.

114.   Mr. Ramirez repeatedly tried to get up, and would fall, hitting his head on the hard surfaces in the cell.

115.   Concerned about Mr. Ramirez suffering from a drug overdose, Medical staff administered Narcan to Mr. Ramirez but observed no improvement.

116.   Mr. Ramirez's physical and mental condition worsened, and he began exhibiting self-harm behaviors such as trying to bite his hands.

117.   CoreCivic correctional personnel were called to the Medical Unit to assist in restraining Mr. Ramirez so that he would not hurt himself.

118.   Defendant Snodgrass later reported that Mr. Ramirez was incoherent, smashing his head against the walls and floor, despite verbal commands for Mr. Ramirez to stop harming himself.

119.   Defendant Snodgrass and other correctional staff forced Mr. Ramirez' wrists and ankles into restraints and improvised a restraint to put around Mr. Ramirez's head.

120.   Medical staff observing Mr. Ramirez were concerned about his mental state.

121.   Medical staff escalated their concerns about Mr. Ramirez's mental and physical condition to the supervising nurse, Defendant Joseph Bounds.

122.   Shift Supervisor Snodgrass later reported that he also directed medical staff to contact Dr. Ivens for Mr. Ramirez to be transferred to the hospital.

123.   Defendant Bounds testified in a deposition that through his experience working for CoreCivic, he came to understand that only the medical director (Keith Ivens) could authorize a hospital transport.

124. As detailed by Defendant Bounds, CoreCivic's policy, custom, and practice prohibited the staff at CCCC from transferring Mr. Ramirez to an outside provider for treatment, even when the staff could not diagnose, treat, or manage Mr. Ramirez's symptoms.

125. Upon information and belief, Defendant Ivens refused to approve hospital transport and dismissed even the supervising staff's concerns, stating that Mr. Ramirez was "a security issue now."

126. Upon information and belief, Defendant Ivens was aware that Mr. Ramirez had been diagnosed with schizophrenia with a history of hallucinations and that Mr. Ramirez had been receiving treatment with anti-psychotic medication.

127. Defendant Dr. Keith Ivens, without examining or even seeing Mr. Ramirez, denied him desperately needed medical intervention.

128. Defendant Ivens blocked all other staff from seeking medical treatment on behalf of Mr. Ramirez.

129. As a result of Dr. Ivens's directive, Mr. Ramirez remained in CCCC under forceful restraint and without access to emergency psychiatric care or even basic necessities, such as food and water.

130. Mr. Ramirez had no way of advocating for himself. He was completely at the mercy of the staff at CCCC.

131. Defendant Bounds, the supervising nurse, can be observed on video footage at or around 11:00 AM entering the cell where Mr. Ramirez was being held.

132. Defendant Bounds does not attempt to assess Mr. Ramirez's vital signs, physical injuries, or his medical and psychiatric history.

133. Defendant Bounds is heard telling the three officers who are forcefully restraining Mr. Ramirez, "So, as soon as he's with it enough that he can say, 'I give you guys permission to take me to the hospital,' he can go get his lip sutured and then they'll evaluate him and treat him from there."

134. The correctional staff are heard pleading with medical staff for help.

135. At 1:18 PM, Defendant Ivens finally authorized personnel at CCCC to transport Mr. Ramirez to the hospital for medical attention and treatment.

136. During this period of waiting, Mr. Ramirez endured hours of physical restraint by three correctional officers, sustained multiple self-inflicted injuries, and suffered severe pain and trauma which could have been easily avoided with proper medical attention denied by Nurse Bounds, Dr. Ivens and other CoreCivic/Correctional Medicine Associates employees, staff, and agents.

*Afternoon of February 14, 2022 (~29 hours before Mr. Ramirez's death)*

137. Mr. Ramirez arrived at Cibola General Hospital Emergency Department at approximately 1:41 PM, accompanied by CoreCivic Recreation Officer P. Tso and Supervisory Detention Officer (SDO) K. Payton.

138. Defendant Joshua Larson, MD, a doctor employed by Cibola General, attended to Mr. Ramirez.

139. Upon information and belief, Defendant Larson was aware that Mr. Ramirez was a detainee in the custody of CoreCivic.

140. Upon information and belief, Defendant Larson was informed of Mr. Ramirez's history of mental illness.

141. Upon information and belief, an agreement or understanding existed between CoreCivic and Cibola General to treat individuals in CoreCivic's custody from CCCC.

142. According to Defendant Larson's medical notes, Mr. Ramirez was "[b]rought in by corrections for repeatedly smashing face on concrete. AMS [Altered mental state], baseball-sized lump on forehead, laceration to R side of head."

143. Defendant Larson recorded vital signs showing that Mr. Ramirez was medically unstable, including a heart rate of 135 beats per minute, blood pressure of 142/75, and oxygen saturation of 90%.

144. Defendant Larson also documented that Mr. Ramirez appeared intoxicated and noted that they smelled alcohol on Mr. Ramirez's breath, but that they were unsure what substance Mr. Ramirez had consumed.

145. Despite Mr. Ramirez's concerning vital signs, the appearance of intoxication, and the possibility of illicit drugs in his system, Defendant Larson and Cibola General staff ordered no bloodwork, lab tests, toxicology screenings, or electrocardiogram (ECG) on Mr. Ramirez.

146. Despite Mr. Ramirez's history of mental illness, Defendant Larson and Cibola General staff did not refer Mr. Ramirez for psychiatric evaluation.

147. Defendant Larson effectively withheld any testing on Mr. Ramirez that would have supplied concrete information about any substances Mr. Ramirez was exposed to, or that would have provided markers to guide Defendant Larson and Cibola General staff on how to proceed with treatment or therapies for Mr. Ramirez.

148. Instead, Defendant Larson ordered cursory imaging, with the sole purpose of clearing Mr. Ramirez to return to CCCC as quickly as possible.

28

149. To address Mr. Ramirez's physical and mental instability, Defendant Larson opted for chemical restraint, ordering a rapid series of sedating medications be administered to Mr. Ramirez.

150. Upon information and belief, Mr. Ramirez did not consent to being administered sedating medication.

151. At the direction of Defendant Larson, without performing any bloodwork to determine possible adverse interactions with suspected ingestion of illicit drugs, and without Mr. Ramirez's consent, Mr. Ramirez was administered the following combination of powerful sedatives by staff in the emergency department of Cibola General:

- 2:28 PM: Ativan 2mg
- 2:44 PM: Haldol 5mg
- 2:59 PM: Ativan 2mg
- 3:19 PM: Ketamine 150mg
- 3:38 PM: Ketamine 150mg

152. Despite being pumped with a cocktail of sedating drugs, Mr. Ramirez was still tachycardic hours later, at the time Mr. Ramirez was discharged back to CCCC.

153. Dr. Larson and Cibola General participated in restraining and controlling Mr. Ramirez as a detainee in custody, without Mr. Ramirez's consent and with blatant disregard for Mr. Ramirez's documented history of a disabling psychiatric condition.

154. Dr. Larson and Cibola General were effectively state actors in their coordination with CoreCivic and CMA staff to control and sedate Mr. Ramirez all with no diagnostic testing to insure that the course of action was safe, much less beneficial.

155. Defendants Larson and Cibola General never treated Mr. Ramirez as a medical patient; they merely acted in concert with CoreCivic and CMA personnel for the sole purpose of restraining Mr. Ramirez so that he could be sent back to CCCC.

156.    Since no toxicology reports or drug screenings were performed, Dr. Larson and hospital staff had no way of knowing if the combination of potent sedatives would adversely interact with any intoxicants Mr. Ramirez may have previously consumed or been exposed to at CCCC.

157.    Defendant Larson sent Mr. Ramirez, accompanied by correctional officers lacking medical training, back to CCCC.

158.    The failure to keep Mr. Ramirez under hospital observation all but guaranteed that whatever physical and mental manifestations Mr. Ramirez faced in the hours and days following would go unmonitored and untreated.

*Evening of February 14, 2022 (less than 24 hours before Mr. Ramirez's death)*

159.    At 6:25 PM on February 14, 2022, Mr. Ramirez was transported back to CCCC by CoreCivic staff P. Tso and K. Payton.

160.    Upon arrival to the CCCC intake station, Mr. Ramirez was severely incapacitated and fell out of his wheelchair.

161.    At approximately 6:45 PM, a Medical Code was called from CCCC's intake station in response to Mr. Ramirez's worsening condition.

162.    Nurse Collete Grant, Nurse V. Pena, and Nurse C. Luckey responded to the Medical Code.

163.    Grant, Pena, and Luckey found Mr. Ramirez sitting on the floor, unable to support himself.

164.    Surveillance video shows that Mr. Ramirez required assistance from two correctional officers to remain in a sitting position and to prevent him from falling to the floor.

165.    Mr. Ramirez was minimally responsive, occasionally opening his eyes and moving his head and limbs.

166.    At 6:53 PM, Mr. Ramirez was restrained to a gurney and transported to the Medical Unit.

167.    In the Medical Unit, Nurse Luckey noted that Mr. Ramirez's heart rate was still elevated at over 110 beats per minute (approximately twice his normal resting heart rate).

168.    Medical staff attempted to take other vital signs, but readings were unreliable because of Mr. Ramirez's movement.

169.    Mr. Ramirez could not support himself, could not communicate his needs, and his medical status was uncertain.

170.    Nurse Luckey called Defendant Keith Ivens to report Mr. Ramirez's condition.

171.    Nurse Luckey requested instructions from Defendant Ivens on how to manage Mr. Ramirez.

172.    Defendant Ivens did not personally complete an assessment of Mr. Ramirez's condition.

173.    Upon information and belief, Defendant Ivens knew that Mr. Ramirez had been chemically sedated at the hospital before returning to CCCC.

174.    Defendant Ivens ordered Mr. Ramirez be transported out of the Medical Unit and into restrictive, segregating housing in a solitary cell.

175.    This transfer to confinement was ordered unilaterally by Defendant Ivens, without affording Mr. Ramirez any assessment or seeking administrative approval to ensure Mr. Ramirez would be safe in confinement.

31

176.    There is no evidence that Defendant Ivens documented his decision to send Mr. Ramirez to confinement on the evening of February 14, 2022, in a way that could have been reviewed by CoreCivic management.

177.    The restrictive housing unit where Mr. Ramirez was confined did not staff any medically trained personnel.

178.    Defendant Ivens effectively cut off all medical oversight of Mr. Ramirez by transferring Mr. Ramirez to confinement, where personnel had no medical training.

179.    Defendant Ivens ordered medical staff to leave Mr. Ramirez in a cell by himself with no medical oversight or monitoring, despite the uncertainty of Mr. Ramirez's condition.

180.    There is also a conflicting record that suggests Dr. Anna Ortiz, the tele-health psychiatrist at CCCC, ordered Mr. Ramirez to be on suicide watch sometime on February 14, 2022, but it is unclear at what time this order was entered.

181.    At 8:00 PM, Mr. Ramirez was transported by gurney from the Medical Unit to segregated housing (SHU/RHU A), despite Mr. Ramirez's incoherence and the lack of a complete medical evaluation.

182.    Mr. Ramirez was left in a cell by himself with three suicide blankets.

183.    Upon information and belief, Defendant Robert Nilius, Warden of CCCC, was kept aware of the situation that had been unfolding with Mr. Ramirez throughout that day.

184.    Upon information and belief, Defendant Nilius knew that Mr. Ramirez had been transported to Cibola General for medical attention and was back in CCCC custody.

185.    Defendant Nilius knew or should have known that Mr. Ramirez was placed in confinement upon returning to CCCC without the requisite documentation and approval.

**February 15, 2022**

186.    In the early morning hours of February 15, 2022, a Medical Code was called to Mr. Ramirez's cell due to apparent concerns about his medical status.

187.    Responding to the Medical Code, Nurse Luckey observed Mr. Ramirez and noted that he remained minimally responsive, only occasionally opening his eyes and moving his head and limbs.

188.    Officers Garcia and Lujan advised Nurse Lucky not to enter Mr. Ramirez's cell to perform an assessment or take Mr. Ramirez's vital signs because they could not ensure her safety.

189.    The COs indicated that they would call again for medical assistance if needed, but no additional calls for medical attention were made during the shift.

190.    At some point, Officers Garcia and Lujan reported to Defendant Bullock, their supervisor, that they were concerned about Mr. Ramirez's well-being and felt he needed constant monitoring.

191.    For unknown reasons, Defendant Bullock dismissed the officers' concerns. He refused their suggestion for additional monitoring of Mr. Ramirez. Defendant Bullock also failed to refer the officers' concerns to medical or mental health staff.

192.    Few details are recorded of the events that occurred between 8:00 AM and 1:00 PM on February 15, 2022.

193.    At approximately 1:52 PM Sergeant (SDO) Valles reported to Nurse Nicolas Arias that Ramirez had not eaten anything that day.

194.    NP Romero-Peralta overheard Valles' report about Mr. Ramirez not eating and (apparently without inquiring about the prior day's events) stated that missing two meals that day did not rise to the level of a hunger strike.

33

195.    Upon information and belief, Mr. Ramirez had not consumed any food or water since February 13, 2022.

196.    According to a statement from Dr. Ortiz, around 4:00 PM Nurse Ken contacted her to report he had been monitoring Mr. Ramirez all day and thought Mr. Ramirez was "psychotic."

197.    Ortiz responded that she would need to evaluate Mr. Ramirez, but that Mr. Ramirez needed to be on 1:1 observation.

198.    Minutes later, Nurse Iredia Odigie entered the restrictive housing unit outside of Mr. Ramirez's cell with the order from Dr. Ortiz.

199.    When Nurse Odigie observed Mr. Ramirez, he had no signs of life.

200.    Nurse Odigie requested the door to Mr. Ramirez's cell be opened.

201.    Correctional staff unlocked the cell door.

202.    Nurse Odigie entered the cell and approached Mr. Ramirez. She checked him for a pulse and respirations.

203.    Nurse Odigie determined that Mr. Ramirez had no pulse and that he was not breathing.

204.    Nurse Odigie began chest compressions and directed the correctional officer to put out a "man down" over the radio.

205.    At or about 4:55 PM, a Medical Code was called to Mr. Ramirez's cell.

206.    Shortly after, supervising officer Defendant Snodgrass directed staff to call for an ambulance.

207.    At 5:05 PM, Narcan was administered to Mr. Ramirez, with no response.

208.    At 5:07 PM, emergency medical technicians (EMTs) arrived at CCCC and were led to Mr. Ramirez's cell, where they continued CPR on Mr. Ramirez.

209. At 5:18 PM, for unknown reasons, Defendant Snodgrass ordered the unit's activity Log Book be closed, effectively eliminating all written tracking of activities in the unit. (The Log Book was not re-started until 6:20 PM.)

210. At 5:31 PM, CPR was stopped, and emergency responders were escorted out of the Restrictive Housing Unit.

211. At 7:17, Defendant Snodgrass escorted Milan Police Department detectives into the restrictive housing unit and led them to Mr. Ramirez's cell.

212. At 7:19 PM, the coroner was escorted to Mr. Ramirez's cell and at 7:21 PM, Mr. Ramirez was officially pronounced dead.

213. Upon information and belief, Defendants Snodgrass and Bullock had unrestricted and unmonitored access to Mr. Ramirez's cell from 5:18 PM until detectives arrived at 7:17 PM.

**CORECIVIC DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF PRISONER PATIENTS UNDER ITS CARE, AND THIS PRACTICE WAS THE MOVING FORCE BEHDIND MR. RAMIREZ'S DEATH.**

214. CoreCivic maintained various widespread patterns and practices which violated Mr. Ramirez's constitutional rights and contributed to his severe injuries, including:

a. failing to establish, maintain, and enforce proper evaluation, diagnosis, and treatment guidelines and standards;

b. failing to evaluate, treat, and manage Mr. Ramirez's medical and mental health conditions;

c. failing to refer Mr. Ramirez to appropriate specialists and individuals who had the ability to timely diagnose and treat his medical and mental health conditions;

d.    failing to develop, employ, and follow appropriate policies and procedures regarding the assessment, treatment, and management of Mr. Ramirez' s medical and mental health history, diagnosis, prognosis, and treatment;

e.    failing to provide Mr. Ramirez with necessary and proper medication management;

f.    failing to take reasonable steps to provide Mr. Ramirez with adequate medical and mental health care; and

g.    failing to protect and preserve the health and safety of Mr. Ramirez.

215.    In essence, CoreCivic's medical care of prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir. 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade…[and] so cursory as to amount to no treatment at all.") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by… proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedure that the inmate population is effectively denied access to adequate medical care.").

216.    CoreCivic has failed to report, diagnose, and treat the warning signs of serious conditions for many other patients, just as it did with Mr. Ramirez. These failures are reflected in the following non-exhaustive list of cases:

- In *Kimberly Ann Krantz, as personal representative for the estate of Justin Krantz v. CoreCivic et al.*, No. D-202-CV-2023-09059 (N.M. 2nd Dist. Ct.), CoreCivic failed to treat the warning signs of Mr. Krantz's suicidal ideations after failing to provide him with any medication for several days.

36

- In *Alejandro M Balderrama v. CoreCivic of Tennessee, LLC, et al.*, No. D-1333-CV-2024-00197 (N.M. 13th Dist. Ct.), CoreCivic failed to report and treat signs of worsening injuries which included a fever, pain and swelling in the foot and ankle with a severe infection in both hands and right foot, and leg and bloody urine.

- In *Kamal Bhula v. CoreCivic, Inc., et al.*, No. D-202-CV-2022-07554 (N.M. 2nd Dist. Ct.), CoreCivic failed to diagnose a tumor and failed to refer the patient to an outside provider in a timely manner, resulting in a long-term tumor to grow.

- In *Guy Bryan v. CoreCivic, Inc., et al.*, No. D-202-2022-00553 (N.M. 2nd Dist. Ct.), CoreCivic failed to diagnose and treat Mr. Bryan's broken collarbone and failed to refer him to an outside provider in a timely manner, resulting in no apparent callus formation which is the sign that a facture is not healing. An unhealed collarbone can lead to a more invasive surgery to fix the fracture later.

217. The preceding cases and others illustrate CoreCivic's persistent refusal to refer prisoner patients to third-party medical providers for the provision of a higher level of care unavailable through CoreCivic.

218. The following information, outlined in various news articles and cases, has publicly documented CoreCivic's widespread practices of improper reporting, diagnosing, monitoring, examining, treating, and referring prisoner patients for off-site services:

- On December 9, 2024, New Mexico Immigrant Law Center a Complaint and Request for Investigation of Medical Neglect at CCCC, for which "Both the U.S. Constitution and the 2011 Performance-Based National Based Standards (PBNDS) set

37

forth clear requirements to protect detained migrants, to which CoreCivic and ICE must adhere at CCCC and TCDF."[7]

- On September 21, 2022, Prison Legal News spoke up about the two lawsuits against CoreCivic, "accuse the company of intentionally understaffing the four prisons it runs in Tennessee to boost profits for shareholders, holding costs at bay by refusing to seek outside medical care for ailing inmates, ignoring drug smuggling by its own guards and failing to keep inmates safe."[8]

- On February 16, 2021, ACLU New Mexico recalled an article from The Nation which exposed evidence of medical neglect at Cibola County Correction Center.[9]

219. The Preceding cases and articles, among others, also establish that CoreCivic and Cibola Country General Hospital were on notice of these widespread unconstitutional practices prior to Mr. Ramirez's injuries and thereby knew that additional safeguards should have been put in place to address patients' signs of serious medical conditions.

220. Accordingly, it can be readily inferred that CoreCivic intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety. And Cibola General Hospital intentionally failed to provide report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety.

221. CoreCivic's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical conditions shares a close factual relationship with the events in

---

[7] https://www.nmilc.org/press-release-archive/cibola-county-medical-neglect

[8] https://www.prisonlegalnews.org/in-the-news/2022/private-prison-contractor-corecivic-hit-two-new-lawsuits-over-inmate-deaths/

[9] https://www.aclu-nm.org/en/news/new-mexico-can-no-longer-shirk-responsibility-end-profit-detention

Mr. Ramirez's case, and accordingly, the widespread practice was the moving force behind his injuries and death.

222.    Significantly, CoreCivic's personnel failed to conduct diagnostic and physical examinations in Mr. Ramirez's case alone, which establishes a pattern and practice of insufficient reporting, diagnosis, and treatment of serious medical conditions.

223.    As such, CoreCivic's policy and practice of failing to report, diagnose, and treat warning signs of serious medical conditions caused the injuries and death of Mr. Ramirez.

224.    CoreCivic failed to provide adequate medical documentation and failed to communicate changes in patient conditions for many other patients in circumstances similar to those of Mr. Ramirez.

225.    Likewise, in Mr. Ramirez's case, CoreCivic failed to provide adequate medical documentation and failed to communicate important changes in Mr. Ramirez's medical condition to providers who had the ability to treat his condition appropriately.

**CIBOLA GENERAL HOSPITAL DEMONSTRATED A PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF PRISONER PATIENTS UNDER ITS CARE, AND THIS PRACTICE WAS THE MOVING FORCE BEHDIND MR. RAMIREZ'S DEATH.**

226.    Despite signs of mental health crisis, chest pain, poor vital signs, Mr. Ramirez was released with minimal care from Cibola General Hospital.

227.    Like Mr. Ramirez, Cibola General had a pattern and practice of treating detainees with minimal and inadequate care, including failing to conduct necessary tests such as bloodwork or ECGs, and discharging detainees despite severe symptoms and life-threatening medical conditions.

228. Cibola General's failure to conduct necessary testing and failure to treat with proper concern along with deciding to discharge detainees, including Mr. Ramirez, despite severe symptoms lead to preventable suffering and death for Plaintiff and other CCCC detainees.

229. Cibola General Hospital and its providers' failure to provide timely and appropriate care for serious medical needs, ignoring medical protocols, failing to intervene, delaying treatment, and releasing detainees back to prison with grossly inadequate minimal or no care, creates a pattern of widespread and systemic indifference to prisoner health.

**CORRECTIONAL MEDICINE ASSOCIATES DEMONSTRATED A PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF PRISONER PATIENTS UNDER ITS CARE, AND THIS PRACTICE WAS THE MOVING FORCE BEHDIND MR. RAMIREZ'S DEATH.**

230. Upon information and belief, CMA was organized specifically to staff CoreCivic-managed facilities with medical personnel, such as a medical doctor.

231. Upon information and belief, only one medical doctor was assigned to provide care to detainees at CCCC—Dr. Keith Ivens. Upon information and belief, Dr. Ivens was the only onsite medical doctor for multiple other facilities. Upon information and belief, despite multiple assignments, Dr. Ivens was identified as a full-time physician for CCCC.

232. CMA maintained various widespread patterns and practices which violated Mr. Ramirez's constitutional rights and contributed to his severe injuries, including:

 a. Failing to staff facilities with adequate medical professionals, as described above

 b. failing to establish, maintain, and enforce proper evaluation, diagnosis, and treatment guidelines and standards;

 c. failing to evaluate, treat, and manage Mr. Ramirez's medical and mental health conditions;

d.  failing to refer Mr. Ramirez to appropriate specialists and individuals who had the ability to timely diagnose and treat his medical and mental health conditions;

e.  failing to develop, employ, and follow appropriate policies and procedures regarding the assessment, treatment, and management of Mr. Ramirez's medical and mental health history, diagnosis, prognosis, and treatment;

f.  failing to provide Mr. Ramirez with necessary and proper medication management;

g.  failing to take reasonable steps to provide Mr. Ramirez with adequate medical and mental health care; and

h.  failing to protect and preserve the health and safety of Mr. Ramirez.

233.    In essence, CMA's medical care of prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir. 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade…[and] so cursory as to amount to no treatment at all.") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by… proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedure that the inmate population is effectively denied access to adequate medical care.").

234.    CMA intentionally implements policies and procedures to delay and deny medical care to inmates as a cost-saving measure.

## III.    COUNTS

### COUNT I
### VIOLATION OF 42 U.S.C. § 1983
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
**(Against Defendants CoreCivic, CMA, Ivens, Bounds, Snodgrass, Bullock, and Nilius)**

235.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

236.    At all relevant times, James Ramirez was a pretrial detainee housed at Cibola County Correctional Center (CCCC), making his constitutional rights protected under the Fourteenth Amendment.

237.    Defendants were deliberately indifferent to Mr. Ramirez's serious medical needs by failing to provide adequate medical and psychiatric care, ignoring his worsening condition, and failing to transport him to a hospital for timely treatment.

238.    Defendant Ivens refused to authorize necessary hospital treatment, directly contributing to Mr. Ramirez's death.

239.    Defendant Bounds failed to ensure medical protocols were followed, preventing Mr. Ramirez from receiving the care he needed.

240.    Defendants Snodgrass and Bullock, as supervisory correctional staff, knew or should have known about Mr. Ramirez's deteriorating condition and failed to intervene.

241.    Defendant Nilius, as Warden, failed to maintain policies and oversight to ensure detainees received proper medical treatment.

242.    Defendants acted with deliberate indifference to Mr. Ramirez's serious medical needs, violating his Fourteenth Amendment rights.

243. As a direct and proximate result of Defendants' deliberate indifference, Mr. Ramirez suffered unnecessary pain, suffering, and ultimately death. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT II**
**VIOLATION OF 42 U.S.C. § 1983**
**FAILURE TO PROTECT FROM HARM**
**(Against Defendants CoreCivic, CMA, Ivens, Bounds, Snodgrass, Bullock, and Nilius)**

202. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

203. Defendants had a duty to ensure Mr. Ramirez's safety and protect him from known dangers, including drug exposure, improper segregation, and inadequate medical treatment.

204. Defendants knew or should have known that CCCC had an ongoing issue with drug trafficking and that Mr. Ramirez, a detainee with severe mental illness, was vulnerable to harm.

205. Despite this knowledge, Defendants failed to take reasonable steps to ensure Mr. Ramirez's safety.

206. Defendant Snodgrass and Bullock refused to take appropriate measures when alerted that Mr. Ramirez was experiencing distress.

207. Defendants Ivens and Bounds refused to provide medical intervention despite clear signs that Mr. Ramirez was in medical crisis.

208. Defendant Nilius failed to implement policies to protect detainees from harm.

209. As a direct and proximate result of Defendants' actions and inactions, Mr. Ramirez suffered severe harm and ultimately died. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT III
### VIOLATION OF 42 U.S.C. § 1983
### UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT
**(Against Defendants CoreCivic, CMA, Ivens, Bounds, Snodgrass, Bullock, and Nilius)**

210.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

211.    Defendants subjected Mr. Ramirez to unconstitutional conditions of confinement, including prolonged solitary confinement without proper medical oversight, inadequate nutrition and hydration, and denial of necessary medical care.

212.    The conditions Mr. Ramirez endured were objectively unreasonable and caused significant deterioration in his physical and mental health.

213.    Defendants knowingly placed Mr. Ramirez in isolation despite his diagnosed mental illness and did so without medical justification.

214.    Defendant Ivens ordered Mr. Ramirez to restrictive housing without evaluating him, exacerbating his suffering.

215.    Defendants' actions violated Mr. Ramirez's Fourteenth Amendment right to humane conditions of confinement.

216.    As a direct and proximate result, Mr. Ramirez suffered severe physical and mental distress leading to his death.

217.    Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983**
**UNCONSTITUTIONAL POLICIES, PRACTICES, OR CUSTOMS**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS UNDER *MONELL***
**(Against Defendants CoreCivic and CMA)**

218.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

219.   CoreCivic, Inc. and CMA were at all relevant times acting under color of and federal law in operating CCCC and providing medical services.

220.   CoreCivic, along with CMA, maintained policies, practices, and customs that led to the denial of necessary medical and psychiatric care to detainees, including but not limited to:

a.   Medical Staffing Deficiencies – CoreCivic maintained chronic vacancies in key medical positions, including two FTE mental health practitioners, eight RN positions, and one FTE physician position, as documented in the ACA Reaccreditation Audit (Jan. 31 - Feb. 2, 2022).

b.   Corporate-Controlled Medical Decisions – CoreCivic required that all significant medical decisions, including hospital transfers, be approved by an off-site corporate physician, delaying emergency care and resulting in preventable deaths.

c.   Failure to Train and Supervise – CoreCivic failed to adequately train medical and correctional staff in recognizing and responding to psychiatric crises and acute medical distress.

d.   Deficient Mental Health Care in Segregation – CoreCivic failed to ensure that medical staff completed required mental health evaluations for detainees in segregation, putting mentally ill detainees at risk of injury and death, as documented in the OIDO Report (Oct. 2023).

e.   Deliberate Indifference to Known Risks of Harm – CoreCivic was aware of prior deaths in the facility due to inadequate medical care, including detainees who died from drug overdoses after ingesting contraband smuggled into CCCC.

221.   These policies, customs, and deliberate failure to provide adequate medical care were the moving force behind Ramirez's death.

45

222.    As a direct and proximate result of Defendants' unconstitutional policies, Ramirez was denied necessary medical treatment, resulting in his preventable death in violation of his Fourteenth Amendment rights. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT V**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)**
**42 U.S.C. § 12132**
**(Against Defendants CoreCivic, CMA, and Cibola General Hospital)**

223.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

224.    Mr. Ramirez was a qualified individual with a disability under the ADA due to his schizophrenia and related mental health conditions, which substantially limited one or more major life activities.

225.    Defendants CoreCivic, CMA, and Cibola General Hospital are entities that receive federal funding and are subject to the ADA.

226.    Defendants discriminated against Mr. Ramirez by failing to provide reasonable accommodations for his disability, including proper medical and psychiatric treatment, housing accommodations, and safeguards against harm.

227.    Defendants CoreCivic and CMA placed Mr. Ramirez in segregation without accommodations and failed to ensure he received prescribed medication.

228.    Defendants CoreCivic and CMA denied Mr. Ramirez access to services, programs, and activities available to non-disabled detainees due to his disability.

46

229.    Defendant Cibola General Hospital discriminated against Mr. Ramirez by failing to provide meaningful medical treatment and needed intervention due to his incapacity and his status as a detainee in government custody.

230.    Defendants ignored his documented and obvious mental health needs.

231.    As a direct and proximate result of Defendants' violations of the ADA, Mr. Ramirez suffered discrimination, pain, suffering, and ultimately death. Plaintiff therefore seeks compensatory and punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 12205, and all other appropriate relief under 42 U.S.C. § 12132.

## COUNT VI
### VIOLATION OF THE REHABILITATION ACT, 29 U.S.C. § 794
### (Against Defendants CoreCivic, CMA, and Cibola General Hospital)

232.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

233.    Mr. Ramirez was an individual with a disability under the Rehabilitation Act due to his diagnosed mental illness.

234.    Defendants CoreCivic, CMA, and Cibola General Hospital receive federal funding and are required to comply with the Rehabilitation Act.

235.    Defendants discriminated against Mr. Ramirez by failing to provide reasonable modifications to their policies, practices, and procedures to ensure he received necessary medical care.

236.    Defendants failed to provide mental health services and accommodations necessary for Mr. Ramirez to safely navigate his confinement.

237.    As a result of Defendants' violations of the Rehabilitation Act, Mr. Ramirez suffered harm and ultimately died. Plaintiff therefore seeks compensatory damages, attorneys' fees, and litigation costs pursuant to Section 505 of the Rehabilitation Act (29 U.S.C. § 794a).

**COUNT VII**
**VIOLATION OF 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**(Against Defendants Cibola General Hospital and Joshua Larson, M.D.)**

238.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

239.    At all relevant times, James Ramirez was a pretrial detainee whose constitutional rights were protected under the Fourteenth Amendment to the U.S. Constitution.

240.    Defendants Cibola General Hospital and Dr. Joshua Larson, M.D., were deliberately indifferent to Mr. Ramirez's serious medical needs, including his altered mental status, potential intoxication, and documented history of schizophrenia.

241.    Defendant Larson was aware that Mr. Ramirez was in an altered mental state and exhibited signs of psychosis, yet he failed to conduct necessary medical testing, including toxicology screens, bloodwork, or an electrocardiogram (ECG), which would have provided essential information for appropriate treatment.

242.    Instead of treating Mr. Ramirez's underlying medical and psychiatric emergency, Defendant Larson opted to administer excessive sedatives—including multiple doses of Ativan, Haldol, and Ketamine—without performing necessary medical assessments or ensuring safe follow-up care.

48

243. Defendants' failure to conduct appropriate testing, medical stabilization, or psychiatric intervention resulted in Mr. Ramirez being chemically restrained rather than treated as a patient in need of urgent medical care.

244. Defendants acted in concert with CoreCivic and CMA officials and staff to facilitate Mr. Ramirez's rapid discharge back to CCCC rather than provide him with constitutionally adequate medical care.

245. Defendant Larson and Cibola General effectively functioned as state actors, as they treated Mr. Ramirez pursuant to a contractual or customary relationship with CoreCivic, thereby assuming responsibility for his medical care while under correctional custody.

246. As a direct and proximate result of Defendants' deliberate indifference, Mr. Ramirez was returned to CCCC in a medically unstable condition, placed in solitary confinement without adequate monitoring, and ultimately suffered a preventable death.

247. Defendants' conduct violated Mr. Ramirez's clearly established constitutional rights under the Fourteenth Amendment to receive adequate medical care as a pretrial detainee.

248. Plaintiff therefore seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

## COUNT VIII
### VIOLATION OF 42 U.S.C. § 1983 – STATE-ACTION LIABILITY & CONSPIRACY TO DEPRIVE CONSTITUTIONAL RIGHTS
### (Against Defendants Cibola General Hospital and Joshua Larson, M.D.)

249. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

250. Defendants Cibola General Hospital and Joshua Larson, M.D., acted jointly with CoreCivic and CCCC correctional officers to deprive Mr. Ramirez of his Fourteenth Amendment rights.

251. Defendant Larson was aware that Mr. Ramirez was a pretrial detainee in CoreCivic custody, yet he failed to act as an independent medical provider, instead prioritizing the interests of CoreCivic over those of his patient.

252. Rather than conducting independent medical assessments and ensuring appropriate treatment, Defendant Larson coordinated with CoreCivic staff to sedate Mr. Ramirez, rendering him further incapacitated and incapable of advocating for himself.

253. Defendants' actions were performed under color of law because they knowingly participated in the restraint and chemical sedation of a detainee without ensuring his medical safety, effectively acting in concert with CoreCivic as state actors.

254. Defendant Larson's deliberate indifference and cooperation with correctional authorities in restraining and discharging Mr. Ramirez without appropriate treatment constituted a conspiracy to deprive Mr. Ramirez of his constitutional rights.

255. The conspiracy between Defendants Cibola General Hospital, Dr. Larson, and CoreCivic officials deprived Mr. Ramirez of necessary and urgent medical intervention, contributing to his deteriorating condition and ultimate death.

256. As a direct and proximate result of Defendants' actions, Mr. Ramirez suffered prolonged distress, deprivation of medical care, and a preventable death.

257. Defendants' actions violated Mr. Ramirez's clearly established constitutional rights under the Fourteenth Amendment, and Plaintiff seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT IX**
**VIOLATION OF 42 U.S.C. § 1983 – FAILURE TO PROVIDE REASONABLE**
**ACCOMMODATIONS UNDER THE FOURTEENTH AMENDMENT**
**(Against Defendants Cibola General Hospital and Joshua Larson, M.D.)**

258.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

259.    Mr. Ramirez was a qualified individual with a disability under the Fourteenth Amendment due to his schizophrenia and documented history of psychosis.

260.    Defendants Cibola General Hospital and Dr. Larson knew or should have known about Mr. Ramirez's psychiatric disability, given his presentation of altered mental status and prior medical history.

261.    Despite this knowledge, Defendants failed to provide reasonable medical accommodations, including ensuring psychiatric consultation, continued medical observation, or appropriate monitoring of potential adverse drug interactions.

262.    Instead, Defendants chemically restrained Mr. Ramirez without his consent and discharged him back to CCCC, where he was at risk of serious harm due to his incapacitated state.

263.    Defendants failed to ensure Mr. Ramirez had the ability to participate in medical decision-making, violating his substantive rights under the Fourteenth Amendment's Due Process Clause.

264.    As a direct and proximate result of Defendants' actions, Mr. Ramirez was denied medical care and reasonable accommodations, leading to his deteriorating condition and ultimate death.

265.    Defendants' conduct violated clearly established constitutional protections under the Fourteenth Amendment, and Plaintiff seeks compensatory and punitive damages, attorneys' fees, and all other appropriate relief under 42 U.S.C. § 1983.

**COUNT X**
**VIOLATION OF 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE TO**
**PAIN AND SUFFERING**
**(Against Defendants CoreCivic, Chief Medical Officer Keith Ivens, MD, Officer**
**Snodgrass, Officer Bullock, Warden Nilius, and Larson)**

266.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

267.    Defendants CoreCivic, Chief Medical Officer Keith Ivens, Officer William Snodgrass, Officer Bullock, Warden Robert Nilius, and Dr. Joshua Larson (collectively, "Defendants") acted with deliberate indifference to Mr. Ramirez's severe pain and suffering, violating his Fourteenth Amendment rights.

268.    Mr. Ramirez suffered from debilitating pain and symptoms of a serious medical condition that was apparent to Defendants. Despite his clear and consistent signs of pain and distress, Defendants failed to provide adequate treatment, medication, or urgent care.

269.    Specifically, CoreCivic's inadequate response to the medical needs of detainees, including Mr. Ramirez, is well-documented. Despite knowing that Mr. Ramirez's condition was deteriorating and that he was at risk of serious complications, CoreCivic allowed extreme delays in providing care, further exacerbating Mr. Ramirez's suffering.

270.    Defendants were aware of Mr. Ramirez's serious medical and mental health condition, including the need for specialized care, yet they failed to act in a timely manner to address his pain or refer him to appropriate medical specialists.

271.    Dr. Joshua Larson, at Cibola General Hospital, discharged Mr. Ramirez despite clear indications of serious medical issues.  Dr. Larson failed to provide adequate diagnostic testing or the necessary care. He improperly discharged Mr. Ramirez back to CCCC, where his pain and suffering went largely untreated.

272.     Defendants Snodgrass and Bullock, as supervisory officers at CCCC, were aware of Mr. Ramirez's deteriorating condition and his need for medical care. They allowed Mr. Ramirez to suffer in excruciating pain without intervening or escalating the issue to appropriate medical personnel. This failure to act constitutes deliberate indifference to Mr. Ramirez's pain.

273.     Defendant Keith Ivens, Chief Medical Officer for CoreCivic, was in a supervisory position and had the authority to ensure that detainees received adequate medical care. Despite his knowledge of Mr. Ramirez's serious condition, Defendant Ivens failed to intervene in his care or authorize an urgent medical transfer to an outside facility. His refusal to authorize such a transfer prolonged Mr. Ramirez's pain, leading to his ultimate death.

274.     Defendants' deliberate indifference to Mr. Ramirez's severe pain and suffering is further evidenced by the systemic pattern of inadequate care at CCCC, which included chronically under-staffed medical units, delayed responses to medical requests, and a general disregard for detainee health. This pattern is consistent with CoreCivic's and CMA's practice of minimizing healthcare expenses at the expense of detainee well-being.

275.     The pain and suffering that Mr. Ramirez endured as a result of Defendants' actions (or inactions) was objectively serious, and a reasonable person in Defendants' position would have recognized that prompt medical attention was necessary. Defendants' failure to provide such attention constitutes deliberate indifference to Mr. Ramirez's pain and an unconstitutional violation of his Fourteenth Amendment rights.

276.     Defendants' actions directly caused Mr. Ramirez to suffer prolonged and excruciating pain, worsening medical conditions, and delayed treatment, all of which contributed to his eventual death. The prolonged suffering and failure to address Mr. Ramirez's needs reflect a pattern of deliberate indifference that violated his rights.

277.    As a direct and proximate result of Defendants' deliberate indifference, Mr. Ramirez suffered unnecessary and severe pain, causing immense physical and emotional distress, and ultimately leading to his untimely death.

## IV.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims triable to a jury.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Estate of James Ramirez, by and through Personal Representative Eugenio Mathis, respectfully requests that this Court enter judgment in Plaintiff's favor and grant the following relief:

1.    Compensatory Damages

    a.    For pain and suffering, mental anguish, emotional distress, and physical suffering endured by James Ramirez before and leading up to his death;

    b.    For medical expenses incurred due to Defendants' unconstitutional and unlawful conduct; and

    c.    For loss of enjoyment of life and the dignitary harms suffered by James Ramirez due to Defendants' violations of Mr. Ramirez's rights.

2.    Punitive Damages

    a.    Against individual Defendants acting under color of law in their personal capacities, pursuant to 42 U.S.C. § 1983, for their willful and malicious violations of James Ramirez's constitutional rights; and

    b.  Against private entities (CoreCivic, Correctional Medicine Associates, and Cibola General Hospital) for reckless and willful disregard of Mr. Ramirez leading to Mr. Ramirez's suffering and death.

3.    Attorneys' Fees and Costs

    a.  Pursuant to 42 U.S.C. § 1988(b), which provides for the recovery of reasonable attorneys' fees for prevailing plaintiffs in civil rights cases under 42 U.S.C. § 1983.

    b.  Pursuant to 42 U.S.C. § 12205, which allows for the recovery of attorneys' fees, litigation expenses, and costs for violations of the Americans with Disabilities Act (ADA).

    c.  Pursuant to 29 U.S.C. § 794a(b), which authorizes attorneys' fees for prevailing plaintiffs in actions brought under Section 504 of the Rehabilitation Act.

4.    Prejudgment and Post-Judgment Interest at the maximum legal rate allowed by law, to fully compensate for the injuries sustained.

5.    Any Further Relief as this Court deems just and proper under law.

Respectfully submitted,

GUEBERT GENTILE PIAZZA & JUNKER P.C.

By   */s/ Elizabeth M. Piazza*
        Elizabeth M. Piazza
        P.O. Box 93880
        Albuquerque, NM 87199
        (505) 823-2300
        epiazza@guebertlaw.com

-and-

COLLINS & COLLINS, P.C.
Rebekah Wright
Francheska Bardacke
Parrish Collins
P. O. Box 506
Albuquerque, NM  87103
(505) 242-5958
rebekah@collinsattorneys.com
francheska@collinsattorneys.com
parrish@collinsattorneys.com

***Attorneys for Plaintiff***

SB/7200.035 Federal/2025.03.27/1st Amended Complaint/jmt